No. 76,183

JANNA REITER, *Appellant,* v. THE CITY OF BELOIT, KANSAS, and CASEY'S GENERAL STORES, INC., *Appellees.*

(947 P.2d 425)

Opinion filed October 31, 1997.

*W. Michael Gentry*, of Purvis & Gentry, of Kansas City, Missouri, argued the cause and was on the brief for appellant.

*Harry W. Gantenbein*, of Beloit, argued the cause and was on the brief for appellee City of Beloit.

*Jerry L. Harrison*, of Noah & Harrison, of Beloit, argued the cause and was on the brief for appellee Casey's General Stores, Inc.

The opinion of the court was delivered by

DAVIS, J.: The City of Beloit (City) granted a change of zoning for construction of a Casey's General Store (Casey's) within the environs of a home included on the National Register of Historic Places. The homeowner appeals from the trial court's decision that the City complied with K.S.A. 75-2724 relating to preservation of historic property. We also conclude that the City complied with Kansas law relating to historic preservation and affirm.

Janna Reiter owns the historic C.A. Perdue House in Beloit, which has been listed on the National Register of Historic Places since November 23, 1977. The owners of the vacant lot adjacent to the Perdue House applied for a zoning change from residential classification to commercial classification. They cited the proposed construction of a Casey's General Store franchise as the reason for the requested change.

Prior to a hearing on the zoning change, the City received a letter from the Kansas State Historical Society advising the City that it could not undertake any project which would encroach upon, damage, or destroy any historic property included in the National Register of Historic Places, or the environs of that property, until the State Historic Preservation Officer (SHPO) had been given notice and the opportunity to investigate and comment. When the matter

came before the City, it was tabled so that proper notice could be given to the SHPO.

The City called a special meeting to discuss the rezoning request. Notice was given to all interested parties, including the SHPO. The SHPO notified the Beloit city administrator by letter that he had conducted his investigation. The text of his letter is set forth in full:

"The materials submitted on the proposed zoning change for the Casey's building to be located within 500 feet of the historic property at 422 W. 8th in Beloit, Kansas, have been reviewed in accordance with the state preservation statute K.S.A. 75-2724. The State Historic Preservation Officer (SHPO) and staff use the Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings [Revised 1990] as a guide to determine if proposed projects encroach upon, damage, or destroy historic properties or their environs. These standards are used across the nation and provide for consistency in staff reviews.

"These guidelines state that the relationship between historic buildings, and streetscape and landscape features within a neighborhood helps to define the historic character of the area and therefore should be preserved. It discourages the introduction of a new building, streetscape, or landscape feature that is out of scale or otherwise inappropriate to the setting's historic character. We believe that the Casey's store will be visually incompatible with the historic C.A. Perdue House and will destroy the historic relationship within the neighborhood. Therefore, the State Historic Preservation Officer has determined that the proposed project will encroach upon, damage, or destroy this historic property or its environs. The project cannot proceed until the city council has determined after consideration of all relevant factors that no 'feasible and prudent alternative' exists to the proposed project and that the project contains provisions to minimize damage to the environs of the historic property. The city is required to give five days' notice of such determination to the SHPO by certified mail.

"The city council has the responsibility of carrying out the intent of the state preservation statute. Serious consideration should be given to finding that no feasible alternatives exist before the council issues a building permit on this project. The state statute allows for anyone aggrieved by the city's determination to file suit and have the issue decided in the courts.

"If you have any questions concerning the review or would like to discuss the project in more detail, I suggest you contact Desmond Anyanwu in the Historic Preservation Office. He can be reached at (913) 296-0788."

Several members of the public as well as Janna Reiter appeared at the special meeting before the City. Casey's appeared through its representative and responded by affidavit on the issue of whether a feasible and prudent alternative existed. The affidavit

submitted by Les Knust, Director of Store Development for Casey's General Stores, Inc., who is responsible for approving all the real estate acquisitions for Casey's in a nine-state region, is set forth in relevant part:

"2. Prior to Casey's purchasing a site for the construction of a new convenience store, I personally view and approve the site. During my tenure as Director of Store Development, I have reviewed hundreds of potential commercial sites for development as a Casey's General Store and have approved over 350 sites for Casey's convenience stores.

"3. In determining whether a tract of real estate is suitable for the development as a Casey's General Store, I analyze a number of factors regarding the real estate. Those would include, among other things, the potential traffic count, the size of the lot, potential contamination, the potential ingress and egress, and the price of the property.

"4. I have consulted with Casey's realtor, Ms. Sue Goding, on the availability of alternative commercial sites in Beloit, Kansas on which to build a Casey's General Store. I have reviewed the alternative commercial sites with Ms. Goding and, taking into consideration the traffic counts, potential contamination, the size of the property and the location of the property, these alternatives are not sites Casey's would purchase to build a convenience store. Based on my review of the sites, it is my opinion, based on all relevant factors, there is no feasible and prudent alternative to the site Casey's has selected in Beloit, Kansas.

"5. Also, the site plan and design of our proposed convenience store in Beloit includes all possible planning to minimize harm to the neighboring historical property resulting from the building and operation of a convenience store. Those factors include, among other things: (a) the fact that Casey's General Store will not face the historic property; (b) that there is an existing natural line of evergreen trees that will buffer the Casey's property from the historic property; (c) that any approach off of the southeast portion of the property, which is adjacent to the historic building, will only include one-way traffic; and (d) Casey's site plan includes the proper design to minimize problems caused by noise, light, and litter associated with the building of a convenience store.

"6. Based on the foregoing, it is my opinion that there is no feasible and prudent alternative to Casey's proposed location in Beloit, and that the design and planning of the store is such that it will minimize harm to the historic property resulting from Casey's use of the site."

At the conclusion of the hearing, the City granted the rezoning application, changing the zoning from R-2 (two-family dwelling district) to C-S (highway service district), which would accommodate the building of a Casey's General Store. The City determined that there was no feasible and prudent alternative. The City also

determined that further discussion on plans to minimize harm to the historic property would be postponed until Casey's applied for a building permit for construction of its convenience store. The City notified the SHPO by certified mail of its decision.

Soon after the zoning change, Casey's applied for a variance from normal set-back requirements, which was granted by the City after a full hearing with proper notice to all interested parties. Casey's then applied for a building permit. The City set the matter for hearing and notified all interested parties of its intent to discuss several issues regarding the Casey's General Store project, including (1) Casey's application for a building permit; (2) the zoning commission's decision to approve the setback variance; and (3) whether these decisions along with the previous zoning change included all possible planning to minimize harm to the Perdue House.

At the conclusion of the public hearing, the City determined that there was no feasible or prudent alternative to the rear yard setback variance. The City also approved the building permit and imposed several conditions on Casey's to minimize the harm to the Perdue House.

Reiter appealed to the district court of Mitchell County. In a well-reasoned opinion, District Judge Thomas M. Tuggle affirmed the City's determination. The text of his opinion is set forth in full, with cites to record exhibits deleted:

### "JUDGMENT FORM

"Now on this 12th day of January, 1996, the court considers the above matter after having received and reviewed the briefs and responsive briefs of plaintiff Janna Reiter ('Reiter'), defendant City of Beloit, Kansas ('City') and defendant Casey's General Stores, Inc. ('Casey's').

#### "Procedural Matters

"1. Reiter filed an action on August 30, 1995, challenging the reasonableness of the decision of the City in granting a rear yardage setback variance and approving the application for a building permit for a Casey's convenience store because the City failed to comply with K.S.A. 75-2724 in not denying the setback variance and building permit in that: (1) other feasible and prudent alternatives to the project exist, or (2) all possible planning to minimize harm to Reiter's

adjoining property has not been accomplished. Review of the City's action is pursuant to K.S.A. 60-2101.

"2. The City and Casey's, pursuant to K.S.A. 60-212(e), moved for a more definite statement and Reiter responded thereto. The motion was denied on October 10, 1995.

"3. At the discovery conference on November 6, 1995, the parties agreed to complete the record on appeal, from the City's files and records. In addition, Reiter requested that the court conduct an evidentiary hearing to supplement the record on appeal.

"4. A Hearing was held on November 30, 1995, at which time the record on appeal was filed with the court and the parties stipulated that the record on appeal contains all of the City's files and records which pertain to the issues on appeal. At the hearing the court further determined that:

(a) the court would review the record on appeal to determine if it was adequate to enable the court to make a determination of the reasonableness of the City's actions. If not, the court would determine how the record should be supplemented;

(b) Reiter would be permitted to make a proffer of additional evidence; and

(c) if the record was adequate for a reasonableness determination, the court would enter final judgment.

### "Findings of Fact

"1. Reiter is the owner of a dwelling house located at 422 West 8th Street, Beloit, Kansas, known as the C.A. Perdue House which has been listed on the National Register of Historic Places since November 23, 1977. Casey's proposes to build a convenience retail store immediately adjoining Reiter's property on the west. Casey's property is on the corner, bounded on the west and south by State Highway 14; the highway adjoins the south side of Reiter's property.

"2. Pursuant to K.S.A. 75-2724, the state historic preservation officer in a letter to the City dated March 7, 1995, stated, in part:

'. . . We believe that the Casey's store will be visually incompatible with the historic C.A. Perdue House and will destroy the historic relationship within the neighborhood. Therefore, the State Historic Preservation Officer has determined that the proposed project will encroach upon, damage, or destroy this historic property or its environs. The project cannot proceed until the city council has determined after consideration of all relevant factors that no "feasible and prudent alternative" exists to the proposed project and that the project contains provisions to minimize damage to the environs of the historic property. The city is required to give five days' notice of such determination to the SHPO by certified mail.'

"3. At a special meeting of the city council held on April 11, 1995, the city council considered the recommendation of the planning commission to change the zoning of Casey's property from R-2 (Two-Family Dwelling District) to C-S (Highway Service District). The city council approved the zoning change because

it appeared there was no feasible and prudent alternative to the proposal. In addition, the city council directed that if a building permit were applied for the administrative staff must consider all issues of the requested permit to minimize harmful situations to the adjoining historical property.

"4. The state historic preservation officer was given notice of the decision on rezoning and made no further contact with the City concerning this matter.

"5. As a result of the determination by the state historic preservation officer that the proposed Casey's project would encroach upon, damage or destroy the historic property or its environs, the city council (in rezoning the Casey's property and granting the setback variance and building permit) was required to determine that there was not a feasible and prudent alternative to the Casey's proposal, and if so, that the Casey's program would include all possible planning to minimize harm to the historic property. These matters were considered at the July 18, 1995, meeting of the city council after notice to all interested parties. Reiter and her attorney were present at the meeting. Reiter did not present any evidence other than her statement to the city council, nor did she request a continuance of the hearing to present additional evidence. At the meeting Reiter's attorney and Casey's attorney made statements to the city council, Casey's attorney presented witnesses, Reiter presented evidence in the form of her statement, members of the public spoke and council members asked questions. There was a thorough and lively discussion of the issues by Reiter, the parties' representatives, members of the public and the council members. The following evidence and information were presented to the city council on the issues:

1. Affidavit of Les Knust, Casey's representative.
2. Testimony of Sue Goding.
3. Testimony of Pat Shea, Beloit Chief of Police.
4. Testimony of Donnie File, Beloit Fire Department.
5. Testimony and written report of Gerald Zimmer, Real Estate Broker.
6. Testimony of Janna Reiter, Owner of historic property.
7. Testimony of Joyce Hall and Elizabeth Flaharty, citizens.
8. Statements and suggested findings by Jerry L. Harrison, Attorney for Casey's General Stores, Inc.
9. Statements and suggested findings by Kenneth Wasserman, Attorney for Janna Reiter.
10. Written report by Ron Becker, Beloit Fire Chief.
11. Letter from Ross K. Boelling, State Fire Marshal's office.
12. Building site plan.
13. Picture of proposed wooden fence.
14. Statements by individual council members, staff and city attorney.

"6. As an alternative to the proposal, Reiter suggested that there be no construction on Casey's property, that she purchase it at an undisclosed price or that Casey's be located elsewhere. Neither of Reiter's proposals for purchase or another site were specific.

"7. Members of the city council expressed a desire to consider the evidence further before making a decision. By agreement of Reiter and Casey's attorneys and the city council, proposed findings of fact and conclusions of law were submitted to the city council at a later date. The city council took the matter under advisement and tabled its decision until the next meeting of the council on August 1, 1995.

"8. The minutes of the city council meeting of August 1, 1995 state:

'Mayor Koster requested Council to render their decision after the hearing on July 18, 1995, which was taken under advisement. After hearing the evidence, reviewing the requested findings of the attorneys and discussion of the issues at the hearing held July 18, 1995, motion was made by Peterson that the City Council finds that there is no feasible and prudent alternative to the rear yardage setback variance as approved in Case No. C-0027 by the Beloit Planning Commission on June 12, 1995 and the approved variance shall be subject to all possible planning to minimize harm to the Perdue House. The motion was seconded by LeSage and the motion carried.

Thereupon the Council considered minimizing issues of the application for building permit and application for building occupancy to the Perdue House. A motion was made by Peterson and seconded by LeSage that the City Council approve the application for the building permit and application for building occupancy on the following conditions to minimize harm to the Perdue House:

1. Provide City Council with written evidence from the Kansas Department of Health and Environment of permit or approval of locations of underground storage of petroleum products and monitoring equipment approved by KDHE.

2. Provide the City Council with written evidence from the State Fire Marshal of permit or approval for petroleum products dispenser location and operating features.

3. Construct a six foot wooden fence similar to the picture of the fence submitted to the council which fence would run the length of the east property line separating the Casey's General Store from the Perdue house.

4. Install gates on the north and south side of the east wall of the building to wooden fence along property line as specified by the Beloit Fire Department.

5. Dumpsters located on the premises shall be enclosed by a fence or walls to prevent public access as specified by the Beloit Fire Chief.

6. Have property posted as provided by law to prevent loitering on the premises, particularly after closing hours. Motion carried.'

"9. The record on appeal shows that the *Golden* factors (*Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 [1978]) were considered:

**"The Character of the Neighborhood**

"At the time of Casey's zoning request, the area in question was essentially undeveloped. It has been zoned as residential area since 1946. The property to the north is vacant and to the south is a fast food restaurant. The properties on the east and west are both single-family housing.

**"The Zoning and Uses of Properties Nearby**

"Properties to the east and west were residential areas with single-family dwellings zoned as R-2, two-family dwellings. The property to the north is designated as residential and zoned as R-2, two-family dwellings, and vacant at the time of Casey's request. The property to the south is designated as commercial, zoned as C-1, general commercial, and is occupied by a fast food restaurant and a car wash. The property to the southwest is designated as industrial and zones as I-2, heavy industrial, which contain the Kansas Department of Transportation. Other properties within 500 feet include designated zones of R-3, multi-family dwelling, and contain the Mitchell County Hospital and Hilltop Nursing Home.

**"The Suitability of the Subject Property for the Uses to Which It Has Been Restricted**

"The vacancy of the lot for such a long period of time speaks for itself as far as the suitability for residential development. Site plans for the building of a Casey's store show the plot can be utilized for commercial use with improvements to U.S. Highway 24 which would help with traffic flow at the intersection of 8th and Independence. These improvements would also help with drainage of the area.

"Phil Thull explained the history of the vacant lot, stating how he had been trying to sell the lot for several years without success and that it was not a money-maker for the owner. Correspondence from Casey's shows that this vacant lot could be turned into a prosperous business which would remain an asset for years to come.

"The minutes of the special meeting of the city council of April 11, 1995, reflect that Sue Goding addressed reasons for selecting the site. John Cashatt, engineer for the City, discussed plans for street improvement and drainage.

**"The Extent to Which Removal of the Restrictions Will Detrimentally Affect Nearby Property**

"Plot plans and a photo of a privacy fence for the proposed Casey's store were submitted to city council for its review as well as testimony from Ron Becker, Fire Chief, Pat Shea, Chief of Police, and Donnie File, First Assistant Fire Chief. The plot plan shows the benefit to the vacant lot.

"Gerald Zimmer's letter of June 29, 1995, and his testimony on July 18, 1995, support the conclusion that the granting of setback variance would not adversely affect the value of Reiter's property.

**"The Length of Time the Subject Property Has Remained Vacant as Zoned**

"The area which has been proposed for building of the Casey's store has been vacant since the city of Beloit was platted. The lot was vacant when Frances H.

Giblin purchased it in 1977. Phil Thull gave a history of the property to the Beloit Planning Commission and at the special council meeting of April 11, 1995.

**"The Relative Gain to the Public Health, Safety and Welfare by the Destruction of the Value of Plaintiff's Property as Compared to the Hardship Imposed Upon the Individual Landowner**

"The street improvement will benefit traffic flow and drainage. The project has been designated as a 1996 safety set-aside project by the Kansas Department of Transportation. Police Chief Pat Shea testified that there should not be a significant traffic problem related to the store nor any other law enforcement problems at the site. Sue Goding indicted if the variance was not approved, the building could not be built because it would not allow for proper space in the front.

**"Recommendation of Professional Staff**

"The administrative staff's opinion is that the only logical use for this property is commercial and that the chance of further residential development is very small.

"10. The record on appeal shows five factors were considered in conjunction with Casey's application for a setback variance. The factors were discussed in Casey's application as well as at the city council meeting of July 18, 1995. The factors were:

(a) Condition unique to the property. Without the setback variance, there is approximately 25 feet running east to west in the middle of the property on which to build. Any building, whether residential or commercial, would present a unique situation.

(b) Effect on adjacent owner. Allowance of the variance would permit the building to face west, away from the historic property. Without the variance, it would be more difficult to limit the harm to the historic property. To the north of the property is a vacant lot and to the south are commercial properties.

(c) Unnecessary hardship. Without the variance, the area on which to build is limited and will effectively preclude any commercial development.

(d) Effect on public health, safety and general welfare. The variance allows the building to be placed so as to better control traffic, litter, parking and vandalism. Easier access and greater visibility by the general public should promote safety.

(e) Conforming with general spirit and intent of the zoning ordinance. The property is located in essentially a commercial and industrial area along a state highway. Placement of the building should allow convenient and safe access by the public. It would eliminate traffic behind the store.

"11. On the planning to minimize harm to Reiter's property, the record on appeal shows several concerns were raised and addressed by the planning commission and the city council:

1. Traffic—access to highway would be controlled. Redesign of intersection in process for 1996 completion.
2. Litter—dumpsters placed in fenced/locked areas.
3. Parking—limited to one area of property.
4. Lighting—indirect and away from historic property.
5. Fire safety—construction of fence to serve as buffer to historic property.
6. Heat—vents to direct heat upward or away from historic building.
7. Vandalism—limited parking and use of fencing. No seating inside building to discourage loitering. No traffic behind building.
8. Privacy—fence to screen view and building to face west away from historic property. Evergreen trees presently shield the property.
9. Public Safety—location of building to allow easier access and greater visibility to general public to reduce accident.
10. Drainage—intersection to be redesigned in 1996.
11. Decrease in property value—testimony of Gerald Zimmer that no substantial impact on value of historic property.
12. Other minimal harm issues contained in entire transcript and tape of city council meeting of July 18, 1995.

### "Conclusions of Law

"1. The record on appeal is adequate for the court to make a reasonableness determination and accordingly Reiter's request to present additional evidence should be denied.

"2. The city council's decision to rezone Casey's property from R-2 (Two-Family Dwelling District) to C-S (Highway Service District) was reasonable.

"3. The city council's decision that there was no feasible and prudent alternative to the Casey's proposal was reasonable.

"4. The city council's decision on how to minimize harm to Reiter's property was reasonable.

"5. The City substantially complied with the requirement of K.S.A. 75-2724 to notify the state historic preservation officer of its decision concerning the permitted use of the Casey's property, and further Reiter does not have standing to raise an objection to any alleged notice deficiency.

### "Comments

"The record on appeal shows a thorough consideration of the issues by the city council after input from the planning commission, the city staff and the persons and attorneys present at the city council meeting on July 18, 1995. The decisions of the city council on rezoning, the setback variance, the building permit and minimizing harm to Reiter's property clearly meet the 'reasonableness' test. See, *Davis v. City of Leavenworth*, 247 Kan. 486, 802 P.2d 494 (1990); *Landau v. City Council of Overland Park*, 244 Kan. 257, 767 P.2d 1290 (1989); *Golden, supra; Lawrence Preservation Alliance, Inc. v. Allen Realty, Inc.*, 16 Kan. App. 2d 93,

819 P.2d 138 (1991); and *Allen Realty, Inc.* v. *City of Lawrence,* 14 Kan. App. 2d 361, 790 P.2d 948 (1990).

"IT IS THEREFORE BY THE COURT ORDERED that plaintiff Janna Reiter's request for judicial relief is denied and the decisions of defendant City of Beloit, Kansas, concerning rezoning, the setback variance, the building permit and minimization of harm to plaintiff's property are in all respects affirmed.

"IT IS FURTHER BY THE COURT ORDERED that the above findings of fact and conclusions of law are made the order of the court."

Reiter appeals from the trial court's decision affirming the City's decision to rezone the property with a variance in setback and to grant a permit to build a Casey's store.

## STANDARD OF REVIEW

Our standard of review is the same standard applied by the trial court. The standard is provided in K.S.A. 75-2724(b), which states in part:

"Any person aggrieved by the determination of a governing body pursuant to this section [historic preservation] may seek review of such determination in accordance with K.S.A. 60-2101 and amendments thereto."

K.S.A. 60-2101(d) provides that a judgment rendered or final order made by a political subdivision exercising judicial or quasi-judicial functions may be reversed, vacated, or modified by the district court on appeal. K.S.A. 60-2101 vests in the Court of Appeals and Supreme Court the same jurisdiction. This appeal was transferred by this court from the Court of Appeals under the provisions of K.S.A. 20-3018(c).

The decision of the City in this case is the final decision of a legislative body, the Beloit City Council. Generally, a decision of a legislative body is quasi-judicial if (1) a state or local law requires notice to the community before the action, (2) a state or local law requires a public hearing pursuant to notice, and (3) a state or local law requires the application of criteria established by law to the specific facts of the case. 83 Am. Jur. 2d, Zoning and Planning § 1023. In this case, all three of the above requirements are present in the City zoning ordinance and in the relevant Kansas historic preservation law, K.S.A 75-2724.

The law regarding appellate review of a final quasi-judicial decision of an administrative agency is well established:

" 'A district court may not, on appeal, substitute its judgment for that of an administrative tribunal, but is restricted to considering whether, as a matter of law, (1) the tribunal acted fraudulently, arbitrarily or capriciously, (2) the administrative order is substantially supported by evidence, and (3) the tribunal's action was within the scope of its authority.

" 'In reviewing a district court's judgment, as above, this court will in the first instance, for the purpose of determining whether the district court observed the requirements and restrictions placed upon it, make the same review of the administrative tribunal's action as does the district court.' " *Board of Johnson County Comm'rs v. J.A. Peterson Co.*, 239 Kan. 112, 114, 716 P.2d 188 (1986) (quoting *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, Syl. ¶¶ 1 and 2, 436 P.2d 828 [1968]).

## KANSAS HISTORIC PRESERVATION ACT
## AND THE SHPO

Because all of the errors raised deal with the application of Kansas law relating to historic preservation, we begin our opinion with a discussion of the law concerning historic preservation.

In K.S.A. 75-2715, the legislature sets forth the public policy regarding historic preservation:

"The legislature hereby finds that the historical, architectural, archeological and cultural heritage of Kansas is an important asset of the state and that its preservation and maintenance should be among the highest priorities of government. It is therefore declared to be the public policy and in the public interest of the state to engage in a comprehensive program of historic preservation and to foster and promote the conservation and use of historic property for the education, inspiration, pleasure and enrichment of the citizens of Kansas."

The Kansas Historic Preservation Act, K.S.A. 75-2715 *et seq.*, creates a state historic preservation agency, known as the Kansas State Historical Society, and provides the agency with such powers as maintaining the State Register of Historic Places and reviewing potential threats to national and state historic properties.

The provision at issue in the present case is K.S.A. 75-2724. Subsection (a) provides:

"(a) The state or any political subdivision of the state, or any instrumentality thereof, shall not undertake any project which will encroach upon, damage or destroy any historic property included in the national register of historic places or

the state register of historic places or the environs of such property until the state historic preservation officer has been given notice, as provided herein, and an opportunity to investigate and comment upon the proposed project. Notice to the state historic preservation officer shall be given by the state or any political subdivision of the state when the proposed project, or any portion thereof, is located within 500 feet of the boundaries of a historic property located within the corporate limits of a city, or within 1000 feet of the boundaries of a historic property located in the unincorporated portion of a county. Notwithstanding the notice herein required, nothing in this section shall be interpreted as limiting the authority of the state historic preservation officer to investigate, comment and make the determinations otherwise permitted by this section regardless of the proximity of any proposed project to the boundaries of a historic property. The state historic preservation officer may solicit the advice and recommendations of the historic sites board of review with respect to such project and may direct that a public hearing or hearing be held thereon. *If the state historic preservation officer determines*, with or without having been given notice of the proposed project, *that such proposed project will encroach upon, damage or destroy any historic property included in the national register of historic places or the state register of historic places or the environs of such property, such project shall not proceed until:* (1) The governor, in the case of a project of the state or an instrumentality thereof, or *the governing body of the political subdivision, in the case of a project of a political subdivision or an instrumentality thereof, has made a determination, based on a consideration of all relevant factors, that there is no feasible and prudent alternative to the proposal and that the program includes all possible planning to minimize harm to such historic property resulting from such use,* and (2) five days' notice of such determination has been given, by certified mail, to the state historic preservation officer." (Emphasis added.)

The term "project" is defined in K.S.A. 75-2716:

"(c) 'Project' includes (1) Activities directly undertaken by the state or any political subdivision of the state, or any instrumentality thereof;

(2) activities undertaken by a person which are supported in whole or in part through grants, subsidies, loans or other forms of financial assistance from the state or any political subdivision of the state, or any instrumentality thereof; and

(3) activities involving the issuance of a lease, permit, license, certificate or other entitlement for use, to any person by the state or any political subdivision of the state, or any instrumentality thereof."

As additional support for the Kansas State Historical Society, the legislature also created a State Historic Sites Board of Review composed of (1) the governor or the governor's designee; (2) the SHPO or such officer's designee; (3) nine members appointed by the governor, at least one of whom shall be professionally qualified in the

field of architecture, one professionally qualified in the field of history, one professionally qualified in the field of prehistoric archeology, one professionally qualified in the field of historic archeology, and one professionally qualified in the field of architectural history. K.S.A. 75-2719(a) requires that a majority of the members of the board shall be professionally qualified in at least one of such fields. Among its powers, the board is to otherwise act in an advisory capacity to the Kansas State Historical Society. K.S.A. 75-2720(f).

The Kansas State Historical Society is granted powers and duties, which include providing information concerning historic properties within the state to the agencies and instrumentalities of the federal, state, and local governments and, where appropriate, to private individuals and organizations and requesting that the attorney general take action authorized under K.S.A. 75-2724(d) against any person or entities who fail to obtain any demolition or building permit required by local or state law. The historical society may further enter into and carry out contracts with local governments or their agencies and with any private party to further the purposes of this Act. K.S.A 75-2722. Finally, the legislature provided that the SHPO shall adopt rules and regulations to implement and administer the provisions of K.S.A. 75-2715 through 75-2725. K.S.A. 75-2721(b).

The Kansas State Historical Society occupies a unique position and plays a major role in the preservation of Kansas historic property and its environs. With this role in mind, the legislature required notice to be given to the SHPO and placed the SHPO in a position to monitor all state or political subdivision projects to determine if such projects would encroach upon, damage, or destroy any historic property included on the National Register of Historic Places or the State Register of Historic Places or the environs of such property.

The SHPO may solicit the advice and recommendations of the Historic Sites Board of Review with respect to such project, may direct that a public hearing or hearings be held thereon on any project contemplated under the Act, and may solicit the aid of local historic preservation societies in carrying out the SHPO functions.

## DISCUSSION AND PRIOR KANSAS DECISIONS

In *Allen Realty, Inc. v. City of Lawrence,* 14 Kan. App. 2d 361, 790 P.2d 948 (1990) (*Allen I*), the plaintiff, Allen Realty, Inc., was the owner of the English Lutheran Church located on a lot within 500 feet of the Douglas County Courthouse. Plaintiff applied for a permit to demolish the building because it was in a state of disrepair and needed substantial improvements before it could be safely inhabited. Not unlike the situation in this case, the SHPO by letter notified the City that demolition "would encroach upon, damage or destroy the environs of the Douglas County Courthouse" and recommended that the demolition permit be denied. After a full hearing before the City Commission, the demolition permit was denied. The plaintiff appealed this denial to the district court, which granted summary judgment in favor of the City. The plaintiff then appealed to the Court of Appeals, which reversed and remanded for a new hearing on the application for a demolition permit. 14 Kan. App. 2d at 374.

The same case later came before the Court of Appeals on slightly different issues in *Lawrence Preservation Alliance, Inc. v. Allen Realty, Inc.,* 16 Kan. App. 2d 93, 819 P.2d 138, *rev. denied* 250 Kan. 805 (1992) (*Allen II*). In this case, the Court of Appeals reiterated the pertinent rulings of *Allen I*: "(1) The proponent of a project has the burden to prove no acceptable alternative exists; (2) a potential alternative is not a 'relevant factor' unless it is supported by evidence to indicate it is both feasible and prudent; and (3) the proponent does not have to refute a potential alternative unless it is proven to be a 'relevant factor.'" 16 Kan. App. 2d at 95.

The Court of Appeals discussed the term "relevant factors" in both *Allen I* and *II,* The court in *Allen I* held that the term "relevant factors" means "something more than mere suggestions as to possible alternatives." 14 Kan. App. 2d at 373. The court stated that "[a] proposed alternative would be a relevant factor if it included sufficient factual information to support a conclusion that such alternative was feasible and prudent. A proposed alternative unsupported by such factual information could not form the premise of

such a conclusion and would not be relevant." 14 Kan. App. 2d at 373. We agree.

However, the term "relevant factors" is not necessarily limited to proposed alternatives. The term "relevant factors" authorizes the governing body to take into consideration all relevant factors relating to the project under consideration. This authorization extends to all those factors logically connected to the ultimate decision of whether there is a feasible and prudent alternative to the proposal and whether the program includes all possible planning to minimize harm to the historical property at issue, including but not limited to, those factors to be considered in any zoning change that we set out in *Golden v. City of Overland Park*, 224 Kan. 591, 598, 584 P.2d 130 (1977). These factors are:

(1) The character of the neighborhood;
(2) the zoning and uses of properties nearby;
(3) the suitability of the subject property for the uses to which it has been restricted;
(4) the extent to which removal of the restrictions will detrimentally affect nearby property;
(5) the length of time the subject property has remained vacant as zoned;
(6) the relative gain to the public health, safety, and welfare by the destruction of the value of plaintiff's property as compared to the hardship imposed upon the individual landowner;
(7) the recommendations of permanent or professional staff; and
(8) the conformance of the requested change to the adopted or recognized master plan being utilized by the city.

Another relevant factor that we believe may be considered by the governing body is the report and reasoning of the SHPO. As we noted above, the Kansas State Historical Society and the SHPO play a major role in any determination concerning the preservation of historic property. The determination of the SHPO that a proposed project will encroach upon, damage, or destroy any listed historic property or its environs automatically triggers the need for a determination by the governing body that there are no feasible

and prudent alternatives. The SHPO's report and the information or lack thereof used by the SHPO in making such a determination may be considered by a governing body as a relevant factor under K.S.A. 75-2724.

As an example, the determination of the SHPO in this case was made by way of a letter sent to the City and was based upon materials submitted on the proposed zoning change for the Casey's building. The letter does not identify the precise information considered by the SHPO. The SHPO states in his letter that the Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings (rev. ed. 1990) (Guidelines) is used as a guide to determine if proposed projects encroach upon, damage, or destroy historic properties or their environs. The Guidelines are not included in the letter, but according to the letter:

"These guidelines state that the relationship between historic buildings, and streetscape and landscape features within a neighborhood helps to define the historic character of the area and therefore should be preserved. It discourages the introduction of a new building, streetscape, or landscape feature that is out of scale or otherwise inappropriate to the setting's historic character."

Based primarily on the above information, the SHPO concluded that "the Casey's store will be visually incompatible with the historic C.A. Perdue House and will destroy the historic relationship within the neighborhood. Therefore, the State Historic Preservation Officer has determined that the proposed project will encroach upon, damage, or destroy this historic property or its environs."

We have reviewed the Guidelines because it forms the basis for the determination of the SHPO. The Guidelines provide the following:

"DISTRICT/NEIGHBORHOOD The relationship between historic buildings, and streetscape and landscape features within a historic district, and streetscape and landscape features *within a historic district or neighborhood* helps to define the historic character and therefore should always be a part of the rehabilitation plans." (Emphasis added.) p. 49.

Thereafter, on page 51, the apparent section referred to in the letter by the SHPO, in the column "Not Recommended," the

Guidelines advise against "[i]ntroducing new construction *into historic districts* that is visually incompatible or that destroys historic relationships within the district or neighborhood." (Emphasis added.)

There is nothing in the record to indicate that we are dealing with a historic district or historic neighborhood. To that extent, the guideline relied upon in the determination of the SHPO does not apply to the case before this court. We would further note that in this case none of the aids available under the law were employed by the SHPO in reaching his determination. The advice and recommendations of the Historic Sites Board of Review, based upon its required expertise in such matters, were not sought. Nor were there any public hearings held on the advisability of the project.

We acknowledge that the use of such aids by the SHPO is discretionary under K.S.A. 75-2724. Nevertheless, the consideration of whether such aids were used becomes significant in assessing the basis for the SHPO's determination of damage to the environs of the Perdue House. Moreover, as our discussion below establishes, in most instances the recommendations of the SHPO is a relevant factor which the City or an appellant may consider when making such a determination or reviewing such a decision.

The SHPO was directed by the legislature to adopt rules and regulations to implement and administer the provisions of the Kansas Historic Preservation Act. See K.S.A. 75-2721(5). Guidance provided by the adoption of rules and regulations implementing the provisions of K.S.A. 75-2724 would be invaluable to all interested parties involved in any project in this state affecting historic property. However, no such rules or regulations have to date been adopted.

We make the above observations because of the major role played by the SHPO in determinations such as this. We believe that the information relied upon by the SHPO is a relevant factor that may be considered by the governing body under K.S.A. 75-2724 and that its relevance does not end with the initial determination made by the SHPO that triggers the need for a determination by the governing body.

Finally, we must address the meaning of the term "no feasible and prudent alternative" within the context of K.S.A. 75-2724. Reiter argues that this phrase should be interpreted to require a finding by the City Council that, as a matter of sound engineering, a Casey's General Store cannot be built in any other location in Beloit and the disadvantages of building the store anywhere else in Beloit would be unique, truly unusual, or reach extraordinary magnitudes. This language is taken from *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411-413, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971), a case interpreting similar language in the then current version of 49 U.S.C. § 303 (1994). The Court of Appeals determined in *Allen II* that cases interpreting the federal statute were helpful in interpreting K.S.A. 75-2724. 16 Kan. App. 2d at 101. We agree.

However, there is a critical distinction between the federal statute and K.S.A. 75-2724. Questions under 49 U.S.C. § 303 involve the taking of public lands or historic sites for the building of a roadway. In such a situation, there is always an alternative route for the roadway, and the primary question to be decided is whether the route is possible, as a matter of sound engineering, and whether circumstances exist that make the alternative one that is not prudent. The question involves the taking of protected property; close scrutiny is warranted.

K.S.A. 75-2724, on the other hand, covers a wide spectrum of possible actions, which do not always implicate a taking of the protected property. In these situations, the phrase "no feasible and prudent alternative" will not be construed as tightly as those situations in which actual destruction of historic property is involved. The decision of the governing body must be made on a case-by-case basis, taking into consideration all of the relevant factors.

Rather than adopt the definition of the phrase "no feasible and prudent alternative" as set out by the United States Supreme Court in *Volpe*, we hold that the words as they are used in K.S.A. 75-2724 are to be given their natural and ordinary meaning. See *Galindo v. City of Coffeyville*, 256 Kan. 455, Syl. ¶ 5, 885 P.2d 1246 (1994). In reviewing a determination of a governing body under K.S.A. 75-2724 that there is no feasible and prudent alternative to

the proposal and that the program includes all possible planning to minimize harm to such historic property, the ultimate question for appellate review is whether the governing body took a hard look at all relevant factors and, using plain common sense, based its determination upon the evidence. See *Hickory Neighborhood Defense League v. Burnley*, 703 F. Supp. 1208, 1219 (W.D.N.C. 1988), *modified on other grounds* 893 F.2d 58 (4th Cir. 1990).

In summary, it is the duty of the governing body under K.S.A. 75-2724 to examine all of the relevant factors and determine whether there is a feasible and prudent alternative to the proposed action. In making such a determination, the governing body may consider any relevant factors logically connected to the ultimate decision of whether there is a feasible and prudent alternative to the proposed project, including the information relied on by the SHPO. The decision of the governing body must necessarily be made on a case-by-case basis, and the scrutiny used by the governing body will depend in large part on the nature of each individual action and the effect such action will have on the historic property or its environs.

Once the governing body has made a decision, it is subject to review in accord with K.S.A. 60-2101. See K.S.A. 75-2724. Our review involves a determination of whether the governing body acted fraudulently, arbitrarily, or capriciously and whether its order was substantially supported by the evidence.

## REITER'S ARGUMENTS

Reiter argues that the City only made determinations that no feasible and prudent alternative exists to rezoning and to the setback variance but failed to make that determination regarding the building of the Casey's General Store next to the Perdue House. In the alternative, she argues that if such a finding was made, it was arbitrary and capricious because nothing in the record shows that anyone offered any evidence of why there is no alternative to this zoning designation. Finally, Reiter argues that the City failed to find the building plan contained all possible planning to minimize harm as required by K.S.A. 75-2724.

Reiter's first argument that no determination was ever made by the City concerning the construction of the store lacks merit. While the City may not have made this determination in issuing the building permit, the hearings and evidence offered before the City and the determination made by the City involved the construction of the store upon the lot being rezoned for the express purpose of accommodating Casey's General Store. Reiter's contention is highly technical and would have us place form over substance. This we refuse to do and find that the determinations required by K.S.A. 75-2724 were in fact made by the City.

Reiter also contends that the City's decision was arbitrary, capricious, and not supported by the evidence. We disagree. The record shows that the City considered not only the recommendations of the SHPO and the testimony of Janna Reiter, both of whom opposed the action, but also several other factors which supported its finding that there was no feasible and prudent alternative. These factors included the affidavit of Les Knust, Director of Store Development for Casey's, in which he concluded that there were no other commercial sites in Beloit upon which to build the store, and the testimony of Sue Goding, Casey's buying agent, explaining why the site was chosen. The decision by the City that there was no feasible or prudent alternative was not arbitrary or capricious and is amply supported by the evidence.

Reiter's final argument is that the City failed to determine, as required by the Act, that all possible plans were considered to minimize the harm done to the historic property. Reiter suggests that the City must take affirmative steps to protect the Perdue House.

Under K.S.A. 75-2724(a), in order for a project to go forward, the governing body is required not only to determine that there is no feasible and prudent alternative to the program but also to determine that "the program includes all possible planning to minimize harm to such historic property resulting from such use." K.S.A. 75-2724(a). This determination is to be made after consideration of all of the relevant factors, and our role is to simply to consider whether the City acted fraudulently, arbitrarily, or capriciously and whether its order is substantially supported by the ev-

idence. See *Board of Johnson County Comm'rs v. J. A. Peterson Co.*, 239 Kan. 112, 114, 716 P.2d 188 (1986).

The record supports the decision of the trial court. The City Council considered ighting, traffic, vandalism, noise, drainage, fire, and trash when it granted the building permit to Casey's. Most of these considerations are reflected in the conditions placed on Casey's in its permit. There is no evidence that the City acted arbitrarily or that the City failed to implement all possible plans to minimize the harm to the historic property.

Affirmed.