GRIFFIN, J.,
dissenting.
I respectfully dissent.
Rather than affirm the School Board’s decision to demolish Roseborough, I would send the case back for further findings consistent with the APA. Based on the record we have, it is impossible to know whether there was a reasonable and prudent alternative to demolition of these historic structures at the time the decision *568 was made. The record consists entirely of minutes of the School Board meetings where this issue was discussed. There was no hearing, no evidence ever was taken and no order was ever issued.
The five buildings that are the subject of this litigation were built by the City of Mount Dora between 1926 and 1934. The buildings are eligible for listing on the National Register of Historic Sites.[1] By 1996, many of the buildings at Rosebor-ough Elementary were in severe disrepair, resulting from years of neglect and lack of maintenance. On March 25, 1996, the School Board asked their annual contract architect (Ray Johnson) to inspect Rose-borough and opine on its condition. Johnson concluded that “[t]he cost to remodel, renovate, and repair all buildings would greatly exceed the cost to build new facilities.” The Board voted to demolish the buildings.
Almost immediately, various groups began to urge the Board to reconsider its decision, including the Mount Dora Historical Society and the City of Mount Dora. Questions were also raised about whether the School Board had complied with section 1.5 of the State Requirements for Educational Facilities [“SREF”] before making the decision to demolish Rosebor-ough Elementary. This provision required:
(2) Demolition or Alteration. Each board shall initiate measures in consultation with the design professionals having preservation expertise and with the Division of Historical Resources of the Department of State to assure that where a historic property is to be demolished or substantially altered, timely steps are taken to determine that no feasible and prudent alternative to the proposed demolition or alteration exists, and, where no such alternative is determined to exist, to assure that timely steps are taken either to avoid or mitigate the adverse effects, or to undertake an appropriate archaeological salvage excavation or other recovery action to document the property as it existed pri- or to demolition or alteration.[2]
(Emphasis added.)
In view of the outcry against demolition, the School Board apparently decided to investigate further. On May 21, 1996, the School Board rescinded its earlier decision to demolish the buddings and authorized a feasibility study regarding rehabilitation.
Harvard, Jolly, Clees, Toop Architects, P.A. [“Harvard, Jolly”] of Winter Park was engaged to conduct the feasibility study. The 115-page document was presented to the School Board on December 9, 1996. The feasibility study concluded that the rehabilitation of the five structures could not be justified using a measure known as the Castaldi Generalized Formula. This formula included a mathematical calculation involving a comparison of the costs associated with rehabilitation versus new construction, divided by the useful life of the building. The cost of rehabilitation ($2,195,611) divided by the useful life of the rehabilitated building (27 years) resulted in a yearly cost figure of $81,319. The report concluded that new construction, which had a useful life of 50 years, resulted in a substantially lower yearly cost figure of $39,200.[3]
*569 At the December 9, 1996 meeting, the Board voted to give the Mayor of Mount Dora time to solicit support from the community to help the Board restore the buildings. The Roseborough issue was readdressed at the School Board’s March 10, 1997 meeting. At the meeting, the Mayor outlined the steps which had been taken to raise funds for the project and expressed confidence that the funds could be obtained. However, there was disagreement on the Board over whether to rehabilitate the buildings. Superintendent Smith recommended that they attempt to renovate only one of the five buddings at Rosebor-ough, with the remaining buildings to be torn down. The City was to be given additional time to raise funds to renovate the remaining budding. This recommendation was approved by the School Board.
The parties attempted to settle the matter during the summer of 1997 but were unable to reach an agreement. Then, at a meeting of the School Board on April 13, 1998, the School Board did an about-face. The Board member who made the proposal noted that money had become available to put permanent buddings (as opposed to portable structures) on the Roseborough site. He stated that $300,000 of the money needed had already been raised and felt confident that the additional monies could be found. The School Board voted unanimously to rescind the earlier demolition order. At the School Board meeting of April 27,1998, there were extended discussions about the decision to rehabditate the buildings. The Board voted 3-2 against reconsidering its earlier decision.
The record is sdent on what occurred regarding Roseborough from May 1998 untd November 1998. At this time, two new Board members replaced former members of the Board and it was decided that a workshop was to be held concerning Roseborough. At the December 11, 1998 workshop, the superintendent urged that Roseborough Elementary should be used for a ninth-grade center, which would give the high school more space.
On June 28,1999, the School Board published a request for bids to demolish the buildings at Roseborough. During the meeting, Superintendent Smith urged the Board to tear down the buildings at Rose-borough and to use the campus to expand Mount Dora High School.
On June 30, 1999, Board members were informed by letter that they would be asked to vote on the demolition of Rose-borough at a meeting on July 12, 1999. The letter, which was written by the Board’s attorney, stated that an updated feasibility study would be provided to each member before the vote. The updated feasibility study showed that the cost of rehabilitation had increased by $500,000, in part because of “construction market increases in the range of 24-28% over the last 3 years” and in part due to the failure to take any steps to prevent further damage to the structures. The Board voted four-to-one in favor of demolition at the July 12, 1999 meeting. This is the vote that is the subject of this appeal.
The “no feasible and prudent alternative” test in Florida Law appears to have been borrowed from federal legislation. In Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), this language was extensively examined. The issue in the Overton Park case was whether the Secretary of Transportation was prevented from authorizing the use of federal funds to finance the construction of highways through public parks if a “feasible and prudent” alternative route existed.
During the course of its opinion, the court discussed the meaning of the “feasible and prudent” language used in the statute, while considering the Secretary’s argument that he had wide-ranging discretion under the statute, since he had to find that an alternative route was “prudent,” and not just feasible. The court, however, *570 rejected the argument that the use of the word “prudent” gave the Secretary wide-ranging discretion to approve a highway through existing parkland:
It is obvious that in most cases considerations of cost, directness of route, and community disruption will indicate that parkland should be used for highway construction whenever possible. Although it may be necessary to transfer funds from one jurisdiction to another, there will always be a smaller outlay required from the public purse when parkland is used since the public already owns the land and there will be no need to pay for right-of-way. And since people do not live or work in parks, if a highway is built on parkland no one will have to leave his home or give up his business. Such factors are common to substantially all highway construction. Thus, if Congress intended these factors to be on an equal footing with preservation of parkland there would have been no need for the statutes.
Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems.
401 U.S. at 411-413, 91 S.Ct. 814, 821-822 (footnotes omitted).
The Florida legislature’s decision to adopt the “feasible and prudent” terminology suggests that the protection of Florida’s historic resources similarly is to be given “paramount importance” and that the destruction of those scant resources should be avoided. This viewpoint is supported by the declaration of state policy regarding historic properties which is contained in section 267.061, Florida Statutes:
267.061. Historic properties; state policy, responsibilities
(1) State policy relative to historic properties.—
(a) The rich and unique heritage of historic properties in this state, representing more than 10,000 years of human presence, is an important legacy to be valued and conserved for present and future generations. The destruction of these nonrenewable historical resources will engender a significant loss to the state’s quality of life, economy, and cultural environment. It is therefore declared to be state policy to:
1. Provide leadership in the preservation of the state’s historic resources;
2. Administer state-owned or state-controlled historic resources in a spirit of stewardship and trusteeship;
3. Contribute to the preservation of nonstate-owned historic resources and to give encouragement to organizations and individuals undertaking preservation by private means;
4. Foster conditions, using measures that include financial and technical assistance, for a harmonious coexistence of society and state historic resources;
> 5. Encourage the public and private preservation and utilization of elements of the state’s historically built environment; and
6. Assist local governments to expand and accelerate their historic preservation programs and activities.
In Reiter v. City of Beloit, 263 Kan. 74, 947 P.2d 425 (1997), the owner of an historic home sought review of the city’s approval of the construction of a store next to the home. The homeowner argued that the project should not be allowed because of a Kansas statute which prohibited a project which would encroach upon, damage or destroy any historic property, un *571 less there was no feasible and prudent alternative to the proposal. The court refused to apply the Overton Park court’s interpretation of the terms “feasible” and “prudent” to the statute before it, finding that the terms should be given their natural and ordinary meaning. The court reasoned:
 Rather than adopt the definition of the phrase “no feasible and prudent alternative” as set out by the United States Supreme Court in Volpe, we hold that the words as they are used in K.S.A. 75-2724 are to be given their natural and ordinary meaning. See Galindo v. City of Coffeyville, 256 Kan. 455, Syl. ¶ 5, 885 P.2d 1246 (1994). In reviewing a determination of a governing body under K.S.A. 75-2724 that there is no feasible and prudent alternative to the proposal and that the program includes all possible planning to minimize harm to such historic property, the ultimate question for appellate review is whether the governing body took a hard look at all relevant factors and, using plain common sense, based its determination upon the evidence. See Hickory Neighborhood Defense League v. Burnley, 703 F.Supp. 1208, 1219 (W.D.N.C.1988), modified on other grounds 893 F.2d 58 (4th Cir.1990).
Id. at 438-439. The Reiter court questioned the indeterminate nature of the “unusual factors” and “unique problems” standards enunciated in Overton Park, but the “hard look”/“plain common sense” test isn’t very helpful either. In the case before us, no matter what the test and no matter how deferential the standard of review, the upshot of this lengthy record is that, apart from the 1996 Harvard, Jolly Report, there is no “evidence,” there are no facts — only dialogue. An analysis like the Harvard, Jolly Report, might be enough to support the Board’s demolition decision, if the decision to demolish had been made in 1996, after the study was issued. But for the ensuing three years, the Board repeatedly voted not to demolish, apparently premised on the notion that there were feasible and prudent alternatives. It is unclear from this record what changed in 1999, other than the composition of the Board. It appears that the Board decided it preferred not to preserve Roseborough but whether this was because there was no feasible and prudent way to do so is simply not reflected in this record. The outcome of this case illustrates that the “no feasible and prudent alternative” test for demolition of historic buildings contained in Florida’s statutes and rules is really nothing but the expression of. an aspirational goal, not a legal threshold.

.The Division of Historical Resources describes the campus at Roseborough as “a unique campus, a very modern design for its time period and reminiscent of some of the early modern work being done in Southern California." Jan Abell, of Abell Garica Partnership Architects, describes the style of Roseborough School as "very unique” in Florida. Jerry W. Mills, an architect with preservation experience, describes the buildings as “fairly unique in their design style, appropriate of that period, and a change from the typical mission style construction during the boom period to one of a more international style and therefore, unusual in this area.”

. See § 267.061 (2)(b), Fla. Stat. (1997).

. Mr. Walter Marder of the Division responded to the Harvard, Jolly feasibility study and notice of intent to demolish on April 15, 1997, questioning the economic feasibility conclusions contained in the study. He asserted that the report’s use of the Castaldi formula *569 was "inappropriate,” as the formula was not designed to evaluate historic schools.