(222 P.3d 535)
No. 100,997

FRIENDS OF THE BETHANY PLACE, INC., *Appellee*, v. CITY OF
TOPEKA and GRACE CATHEDRAL AND THE EPISCOPAL
DIOCESE OF KANSAS, INC., *Appellants*.

Opinion filed January 22, 2010.

*Eric B. Smith* and *Shelly Theis Starr*, assistant city attorneys, and *Mary Beth Mudrick*, chief of litigation, for appellant City of Topeka.

*Nathan D. Leadstrom* and *H. Philip Elwood*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, for appellants Grace Cathedral and The Episcopal Diocese of Kansas, Inc.

*Pedro L. Irigonegaray*, of Irigonegaray & Associates, of Topeka, and *Shelley Hickman Clark*, of University of Kansas School of Law, of Lawrence, for appellee Friends of Bethany Place, Inc.

*Sandra Jacquot*, general counsel, and *Donald L. Moler, Jr.*, executive director, of League of Kansas Municipalities, of Topeka, were on the brief for *amicus curiae* League of Kansas Municipalities.

*Derenda J. Mitchell* and *Michael J. Smith*, assistant attorneys general, and *Steve Six*, attorney general, were on the brief for *amicus curiae* Kansas State Historical Society.

Before RULON, C.J., GREENE and MCANANY, JJ.

MCANANY, J.: This appeal centers on a contentious plan by Grace Episcopal Cathedral (Cathedral) in Topeka and The Episcopal Diocese of Kansas, Inc. (collectively the Church), to construct a parking lot on a portion of Bethany Place, a tract of ground on which the Cathedral and two other buildings are located. These two other buildings and the surrounding grounds of Bethany Place (but not the Cathedral itself) are listed on the Register of Historic Kansas Places. The State Historical Preservation Officer (SHPO) opposed the project.

The matter came before the Topeka City Council (Council) on the Church's application for a permit for the project. On the day before the hearing on the Church's application, a group of individuals formed Friends of Bethany Place, Inc. (FOB), in order to oppose the project. Following testimony from numerous proponents and opponents, the Council voted 9-0 in favor of the Church's application.

FOB appealed to the district court. The district court set aside the Council's approval of the project, finding the Council's decision was arbitrary, capricious, and unreasonable. The City of Topeka (City) and the Church have now appealed the district court's de-

cision. The matter has been fully briefed and argued by the parties, and we have the added benefit of *amici curiae* briefs from the Kansas State Historical Society and the League of Kansas Municipalities. This appeal presents the following four main issues for us to resolve:

1. **Does FOB have standing in these proceedings?**

   Yes. Applying statutory and traditional standards for standing, FOB is entitled to seek judicial review of the Council's approval of the Church's permit application.

2. **Did the district court erroneously reweigh the evidence before the Council, evidence which (according to the Church and the City) provided substantial support for the Council's decision to grant the permit?**

   Yes. The district court went beyond the record and reweighed the evidence before the Council in finding what it considered to be feasible and prudent alternatives to the Church's proposed project. The proper scope of review limits a reviewing court to determining (1) whether the Council acted fraudulently, arbitrarily, or capriciously, (2) whether the Council's action is supported by substantial evidence, and (3) whether the Council acted within the scope of its authority. Here, the issue in dispute is whether substantial evidence supports the Council's action. Applying the requisite legal constraints on the scope of our review, we conclude that there is substantial evidence to support the decision to grant the Church's requested permit.

3. **Does the district court's decision violate the Church's rights under the First Amendment to the United States Constitution or under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc (2006)?**

   Because of our decision on Issue 2, it is unnecessary to consider this issue.

4. **Did the district court err in refusing to require FOB to post a supersedeas bond for this appeal?**

   No. FOB prevailed before the district court and did not seek to

stay enforcement of the district court's ruling. As the appellee, the provisions for a supersedeas bond do not apply to FOB.

*Facts*

In 1861, the Topeka city founders conveyed to the Church 20 acres of land, now known as Bethany Place, in order to establish the Sisters of Bethany Episcopal School for Girls. The property is bordered by 8th Street, Polk Street, 10th Avenue, and Western Avenue in downtown Topeka. The two historic buildings on the property were built in 1874 and 1875. One is the Diocesan offices building (formerly the school laundry), and the other is a building for meetings and lodging (formerly the school's barn).

The school was in operation at Bethany Place from 1872 until 1928. In 1917, Grace Cathedral was constructed on the property. In 1929, the Topeka School District acquired 14 acres of the original Bethany campus for the construction of Topeka High School. In 1978, the Church registered Bethany Place on the Kansas Historical Registry in order to prevent Topeka High School from acquiring any of the remaining 6 acres by eminent domain.

In 2007, the Church applied for a permit to install a parking lot on part of the Bethany Place property. The plan was to add 40 parking spaces, with 10 reserved for handicapped or elderly Church members. The proposed lot would consist of opposing rows of parking stalls located inside the sidewalk along Polk Street. The lot would occupy 4.5% of Bethany Place's grounds. It would reduce the current green space from 187,800 to 175,800 square feet, or 6.5%.

On May 8, 2007, the SHPO assigned to review the Church's permit application determined that the parking lot would encroach upon, damage, or destroy the historic environs of Bethany Place because the project would require the removal of mature trees and because the project would "drastically [change] the relationship between the two historic buildings on the site with the public street of Polk." The SHPO proposed the alternative of constructing angled parking on Polk and 8th Streets.

The following day, upon receipt of the SHPO's report, the City's Planning Department denied the Church's permit request and sug-

gested that parking along Southwest Polk Street would be a feasible alternative.

On August 27, 2007, 1 day before the Council met to consider the Church's application, FOB was incorporated for the purpose of opposing the Church's parking lot application. That same day the SHPO issued a supplemental letter opinion on the project. The letter further explained but did not change the SHPO's recommendation of May 8, 2007. It did not address further the alternative of on-street angled parking. Because of the lateness of its submission, the letter was not provided to the Council for consideration at the hearing.

### Proceedings before the Council

The Council considered the Church's application on August 28, 2007. The Church's position was that the angled street parking recommended by the City's Planning Department and the SHPO and other suggested alternatives from those speaking in opposition were not feasible and prudent.

The Council heard testimony from many members of the public who either supported or opposed the project, including representatives of the Church, FOB, and various Topeka neighborhood improvement associations. Testimony was received through oral comments during the meeting. In addition, Council members were provided with a packet of documents assembled for them in advance of the meeting. Because, as we shall see, the central issue is the sufficiency of the evidence to support the Council's decision, we will recount the oral testimony and written documents presented to the Council in making its decision.

### Testimony at the Council Meeting

• *Pedro Irigonegaray*

Pedro Irigonegaray, counsel for FOB, reminded the Council of the requirements of K.S.A. 2008 Supp. 75-2724. He testified that to approve the permit, the Council must find that there is no feasible and prudent alternative to the proposed parking lot and that all possible planning to minimize the harm to Bethany Place had

been undertaken. He also cautioned the Council that it could not act in an arbitrary or capricious manner.

• *Alex Kovalchuck*

Alex Kovalchuck testified in opposition to the Church's proposal. He presented a map to the Council showing suggested alternatives to the Church's plan: (1) angled on-street parking, (2) using lots on the north side of 8th Street owned by the Church, and (3) building a parking garage over the Church's existing parking lot. He presented the Council with a CD video which he said would help the Council "visualize and see what I'm attempting to discuss." However, he apparently failed to bring equipment to the hearing with which to display his video. Kovalchuck presented no cost estimates for his proposals, though he did acknowledge that they "may be . . . more expensive [than the Church's proposal]." He also did not address any of the safety concerns raised by the Church, nor did he address the Church's concerns about its inability to restrict the use of street parking to its members.

• *Bishop Dean Wolfe*

Bishop Dean Wolfe testified on behalf of the Church. He reminded the Council that the Church was seeking 40 additional parking spots to supplement its parking lot and the current public parking available on 8th and Polk Streets because the Cathedral needs one parking space for every 1.8 persons in attendance. The Bishop testified that the Cathedral currently has a Sunday attendance of about 350 people and a current parking lot capacity of 89 spaces. The proposed additional 40 spaces would help address this need and provide handicap parking next to the Cathedral with no steps to climb. He testified that as part of the project, the Church planned to plant "more than twice as many trees as we take out, all to enhance our green space."

• *Dean Steve Lipscomb*

Steve Lipscomb, Dean of Grace Cathedral, testified about the alternatives the Church had considered and rejected:

"The first would have extended our existing parking lot to the south. We rejected that because it would come too close to the historic buildings and would take away from the gardens and picnic area that are the most visited section of

the property. It also wouldn't give us the closer end [*sic*] handicap accessible parking we need near our worship space entrance.

"We also considered parking off the alley south of the Cathedral. This isn't an option because there are utility poles and an air conditioning unit there the size of a freight car. Plus, we already use that space for parallel parking so the gain would be minimal.

"We own a small, narrow lot across 8th Street from the Cathedral, but that is not a reasonable option for us because that entrance requires climbing 14 steps and we didn't want to endanger children and older members by making them cross a busy four-lane street.

"We decided against angled parking on either 8th Avenue or Polk Street for several reasons. Safety was a major factor with the possibility of children darting into the street from between cars and members, especially elderly members backing out into traffic.

"These on-street spots would also require the use of concrete, which costs twice as much as asphalt. And since there already is parallel parking permitted along both streets, . . . diagonal parking on the street would not gain us that many additional spaces. In fact, if you took away the parallel parking it would only gain us a net of about half as many spaces as this alternative suggests.

"But a main concern is that this would require the Cathedral to build something it could never own. The city would own these parking spaces and it would be public parking. With Topeka High and several apartments nearby, the spaces would be filled almost all the time. And we've been told that we could reserve these if we gave advance notice and by placing barricades to block them. That is not a feasible alternative for us. There is no guarantee we would have access to these spaces when we needed them. Frankly, I would have a hard time explaining to my congregation why we were using church funds to build public parking. . . . It's not just illogical, it's bad stewardship of what has been entrusted to us and it limits our ability to do ministry."

Dean Lipscomb stated that if the parking lot were built, 4 acres of green space would remain on Bethany Place grounds. He stated that the Church's proposal was the only plan that "will put this many parking spaces this close to our worship space entrance unobstructed by steps."

The Council members had copies of the records before the City Planning Department, which included Dean Lipscomb's expanded concerns about angled on-street parking. Lipscomb explained to the City staff that this on-street parking

"would not meet our needs for a couple of reasons. First, we could not reserve on street parking for church use. During the week, Topeka High would take all available spaces and those living in the apartments on the east side of Polk would

use them all the time. Weekday funerals, diocesan-wide meetings and those of community organizations that use our space are often some of our most attended events, requiring much more parking than we currently have. Evening events such as concerts, plays, graduation ceremonies, holy day services and other community events often overfill our current lot and require people to park, not only along 8th and Polk streets but also on Taylor, Western and Tyler. There are clearly safety issues for nighttime pedestrians in these areas, particularly north of 8th Avenue. We need reserved parking on weekdays as much as on Sundays. . . . Even with the 40 additional spaces proposed, we will still require the on street parking to meet our needs."

Councilman Richard Harmon asked Dean Lipscomb whether the Church would have the same problem with neighbors using the Church's parking lot if the parking lot were constructed. Lipscomb replied that because the lot will be on Church property, the Church could restrict access to it, obviating the problem of the parking being used by the Church's neighbors. Finally, Dean Lipscomb testified that "Sundays are not our only issue. I mean, we have evening events [and] funerals during the week."

• *Melodie Worman*

Melodie Worman, the Church's director of communications, described the history of Bethany Place. She pointed out that due to conversions of the two historic buildings to other uses, neither was on the National Registry of Historic Sites. Further, the Cathedral is not on the State's historic registry.

• *Cynthia Sheppeard Langston*

Cynthia Sheppeard Langston, a member of the Church, spoke to the need for accessible spaces for handicapped persons. There are currently only six such spaces. The alternative of curb parking is neither feasible nor prudent because of the grade that would be difficult to negotiate from the curb to the Cathedral. The Church's proposal would provide parking on the same level as the Cathedral.

• *Barbara Quaney*

Barbara Quaney, the president of FOB, testified in opposition to the project. She spoke of the historic significance of Bethany Place and the importance of preserving it. She listed three alternative sites that FOB believed would be feasible and prudent. She advocated the use of angled parking on 8th and Polk Streets. She did not address the Church's cost or safety concerns, nor did she

address the Church's concern about others using these parking spaces to the exclusion of Church members or using Church funds to develop public property. However, she did express the opinion based upon her experience as a physical therapist that angled parking could be designed and executed to address the accessibility issue.

• *Tom Bartlett*

Tom Bartlett, of the Holiday Park Neighborhood Improvement Association, testified to his association's desire to preserve Bethany Place and their opposition to the project. He did not address the feasibility or prudence of any alternatives.

• *Douglas Jones*

Douglas Jones, Barbara Quaney's husband, described the family business of buying and restoring old homes in the central core. He expressed opposition to the project. He is the immediate past president of the Shawnee County Historical Society. He noted that Old Town is the only Topeka neighborhood improvement association "without a park, and has very little greenspace compared to other neighborhoods." He argued that the project is contrary to recent comments by City consultants regarding "greenspace and aesthetic issues," and would establish a bad precedent. He did not address the feasibility or prudence of any suggested alternatives.

• *Robert Banks*

Robert Banks, chairman of Topeka Turnaround Team, Inc., spoke in opposition to the plan. He offered the good offices of the Turnaround Team to help mediate the dispute.

• *Maura Dingman*

Maura Dingman spoke in opposition to the plan. Dingman owns and restored six properties in Holiday Park. She expressed her heartfelt desire and the desire of others in the area who have invested in restoring older properties to preserve historic sites and deny this permit application.

• *Greg Fox*

Greg Fox, who operates his business in a historic building, acknowledged that the Church needs more parking but expressed concern about "changing our minds on something we've already decided."

- *Peter Hancock*

Peter Hancock, president of the Old Town Neighborhood Improvement Association, testified to his organization's opposition to the plan. He testified to the lack of greenspace in the area and the lack of a neighborhood park. He observed that St. Patrick's Cathedral in New York City functions without a lot of parking. He did not address any alternatives to the Church's plan.

- *Hiram Stockwell*

Hiram Stockwell, a resident of the Old Town neighborhood, spoke of the history of the neighborhood. He testified that the Church's safety concerns were an insult to its neighbors. He stated that the Church's lot on the north side of 8th Street at 816 S.W. 8th contains "over 10,000 square feet and is approximately equal to the proposed parking space." Another Church lot at 804 S.W. 8th contains "over 6,000 square feet." He also observed: "There is additional space near the circular and south drives at the east side of the church that could accommodate" accessible parking for the handicapped and elderly. He did not offer any cost estimates for his proposals.

- *Kathryn Hosfelt*

Kathryn Hosfelt, a neighbor in the central core, expressed her desire to preserve Bethany Place.

- *Anne Spiess*

Anne Spiess, president of the Shawnee County Historical Society, is a Church member and a member of FOB. She spoke of the historic significance of Bethany Place. She testified that the Church's plan would eliminate trees and greenspace. She mentioned the suggested alternative sites, though she did not address the issues of feasibility or prudence.

- *Ed Spiess*

Church member Ed Spiess testified in opposition to the parking lot. He suggested restriping a portion of the existing parking lot to create more handicap-accessible spaces. He did not address the Church's overall need for more parking and made no suggestions as to where the Church would recoup the space it would lose through his proposal.

• *Alvin Greeson*

Alvin Greeson, a Church member and neighbor, suggested alternative parking on the "half semicircular entrance on the east side of the Cathedral." He had measured the area and estimated there could be approximately 32 additional parking places in that area. He offered no design proposals or cost estimates to support his idea.

• *Janet Loebel*

Janet Loebel, a retired teacher, spoke of her family's history in the area. She spoke to the value of history and heritage. She urged the Council to reject the Church's application.

• *Joanne Harrison*

Joanne Harrison, a Church member, spoke of the importance of Bethany Place. She suggested "turning the alley off of Polk Street the other direction, which would then quickly enable cars to move down to the present parking lot." She said she had no problem finding a parking place on Polk Street on Sunday mornings. She also urged the Mayor to write a letter to Dean Lipscomb telling him to stop "urging people to park on the grass at Bethany Place."

• *Peter Muraski*

Peter Muraski, a science teacher, spoke of the age and condition of the trees on the site, though he professed no expertise on the subject other than having cut down many trees in years past for firewood. He opposed the project. "If we alter this place it may set a precedent we don't want."

• *Michael Bradley*

Michael Bradley opined that this project will harm the Church and its mission. He expressed the desire to preserve open spaces in urban areas. He urged the Council to deny a permit.

*Documents at the Council Meeting*

In advance of the meeting, each Council member had been provided a packet of information regarding the application. The packets contained the Council Action Form which informed the Council members that approval of the Church's appeal would overturn the decision of the SHPO and that

"State law allows the local governing body to overturn the findings of the State of Kansas Historic Preservation Officer when they have determined that based on all relevant factors, there is no feasible and prudent alternative to the proposed parking lot and that all possible planning to minimize harm to the historic property and its environs has been included.

"The SHPO has proposed using the city's right-of-way for the necessary parking as a feasible and prudent alternative to the constructing the parking lot on historic property which includes the removal of many historic trees.

"The Old Town Neighborhood Improvement Association has officially stated their opposition to the proposed parking lot within the grounds of the Bethany Place campus."

The packets also included: (1) copies of the statutes relating to historic preservation; (2) the City Planning Department's recommendation; (3) the SHPO's recommendation; (4) photos, maps, and diagrams of the area; (5) descriptions of the historic buildings and the history of Bethany Place; (6) the Historic Old Town Neighborhood Plan; (7) documents relating to the placement of Bethany Place on the Register of Historic Kansas Places in 1979; (8) documents regarding a conference center proposed for construction on Bethany Place in 1983, which was approved by the SHPO but never built; (9) letters and e-mails in support and opposition from various members of the community, many of which were essentially verbatim the oral testimony provided at the Council meeting; (10) a petition signed by a number of persons opposing the project; (11) engineering reports on the size of the project relative to Bethany Place overall and the added cost of the angled parking alternative; and (12) a horticultural assessment of the project.

With respect to item (2), it is important to note that the City Planning Department's recommendation that the Church's application be denied was based on "alternative and feasible alternatives that will not encroach upon or damage the listed property." While the planning staff recommendation speaks of "alternatives," it makes reference to only one: a determination by the City traffic engineers that "angled 'cut-back' parking along Southwest Polk Street, adjacent to the Bethany Place property would be a feasible alternative to the proposed parking lot." There is no report or study by the City's traffic engineers in the record. There is no analysis by either the planning staff or the traffic engineers to explain how

this angled parking suggestion rises to the level of a feasible and prudent alternative.

The SHPO's recommendation, item (3), is for the Church to redesign "the project to take advantage of the City's right-of-way by designing parking stalls directly adjacent to the street at Polk and possibly 8th Street if needed." This suggestion is not accompanied by any supporting analysis whatsoever.

Item (6), the Historic Old Town Neighborhood Plan, addresses the need to maintain the historic character of the neighborhood, particularly the housing stock in the "core" area. It is worth noting that the criticism of the Church's plan is not to whether additional parking spaces should be created in the neighborhood, but rather where those parking spaces should be located.

Item (11) is an engineering report prepared for the Church which shows the size of the proposed parking lot relative to the overall size of Bethany Place. It also calculates the cost of concrete for 40 parking places ($36,000) compared to the cost of asphalt for 40 parking places ($16,800). This is the only engineering report in the record.

### Council Action

At the close of the public comments, Councilman Jeff Preisner moved to approve the Church's permit application based on "the City Council's consideration of all relevant factors, that there are no feasible and prudent alternatives to the proposal, and that all possible planning has been undertaken to minimize harm to the historic property." The motion was seconded, and Councilman John Alcala asked the City Attorney Brenden Long: "[D]o we infringe on the First and Fourteenth Amendment of free exercise of religion if we don't grant the permit? The city attorney responded:

"[T]o override the recommendation of the State Historic Preservation Officer, [the Council] must find, based on a consideration of the factors, as Mr. Preisner pointed out, that there's no feasible and prudent alternatives to the proposal. That consideration is really going to be based on all that was presented to you tonight, as well as the packets of information that you received with your agenda analyzing the needs of the applicant, the needs of the community, the attempt to maintain those - - the historic character of the site and part of it's an economic determination, part of it is a technical determination."

The city attorney then described *Mt. St. Scholastica v. City of Atchison*, 482 F. Supp. 2d 1281 (D. Kan. 2007), before concluding that the City "probably faces some potential legal action at least whichever way you go."

Councilman Brett Blackburn observed that "there's probably not a feasible alternative." He concluded that "it comes down to our opinion if we think there is or is not a reasonable alternative."

Councilman Harmon asked the city attorney: "[A]re there any findings of fact we need to make in order to - - separate and apart from Councilman Preisner's motion with respect to the First Amendment issue if that's the basis upon which we wish to overrule the [SHPO] finding?" The city attorney responded: " No. I think your first task here is really to make your determination based on [K.S.A. 2008 Supp. 75-2724] with the understanding that . . . a denial of the parking permit could create some legal issues."

The Council voted 9-0 in favor of the Church's permit application.

### *Proceedings in the District Court*

FOB appealed to the district court pursuant to K.S.A. 2008 Supp. 75-2724(b) and K.S.A. 60-2101(d). The City challenged FOB's standing to bring this action, arguing that FOB was not an "aggrieved party" under K.S.A. 60-2101(d) because FOB had no right or pecuniary interest in Bethany Place. FOB responded with affidavits from its members detailing their interests in Bethany Place.

The district court denied the City's motion, finding that K.S.A. 2008 Supp. 75-2724, which specifically applies to " 'historic preservation activities' " affected by projects gives standing to FOB. The court reasoned that the public notice and the civil penalty features of K.S.A. 2008 Supp. 75-2724 inferred an actionable "periphery interest" which extends beyond a potential plaintiff's pecuniary interests and includes "community pride in historic preservation[,] . . . quality of life and esthetics."

The Church informed FOB that because construction costs were expected to increase by $41,000 during the pendency of this action, the Church intended to proceed with construction of the parking

lot unless FOB posted a $50,000 bond. FOB responded with a motion for a restraining order pursuant to K.S.A. 60-903.

At the hearing on FOB's motion, the Church pointed out that FOB had no assets or income with which to compensate the Church for the delay if FOB's appeal failed. The court granted a restraining order against the Church and denied the Church's request that FOB post a bond, concluding that there was no statutory provision for a bond.

In its detailed memorandum opinion on the merits of FOB's appeal, the district court set aside the Church's permit, concluding that the Council's action in approving the permit application was arbitrary, capricious, and unreasonable. The City and the Church appeal.

*1. Does FOB Have Standing in These Proceedings?*

The standing issue raised by the City and the Church is predicated upon FOB's lack of any legal right or pecuniary interest in the matter. They rely primarily on *Linsea v. Board of Chase County Comm'rs*, 12 Kan. App. 2d 657, 753 P.2d 1292, *rev. denied* 243 Kan. 779 (1988), for this argument.

The Church also argues that (1) the statutory scheme of K.S.A. 2008 Supp. 75-2724 and K.S.A. 75-2725 empowers only the Kansas Attorney General to proceed against landowners to enforce the provisions of the Kansas Historical Preservation Act, see K.S.A. 75-2714 *et seq.*, and (2) because FOB's mission is historical preservation for aesthetic reasons, not the preservation of property values near Bethany Place, and because historical preservation is a public interest instead of a private one, FOB lacks standing under *NEA-Coffeyville v. U.S.D. No. 445*, 268 Kan. 384, 996 P.2d 821 (2000).

FOB argues that in order to fulfill the purpose of the Historic Preservation Act, standing under K.S.A. 2008 Supp. 75-2724 should be broadly construed to allow groups of concerned citizens to form organizations like FOB to protect historic properties. FOB also argues that it has standing under *Coffeyville* because the project would lower the property values of FOB members who own property near Bethany Place.

*Standard of Review*

Standing is an issue of law which appellate courts review de novo. *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 185, 106 P.3d 483 (2005). " ' "Regardless of the merits of [a claim], without [a party having] standing, the court cannot entertain the action." ' [Citations omitted.]" 279 Kan. at 185.

*Discussion*

The Kansas Historical Preservation Act provides that "[a]ny person aggrieved by the determination of a governing body pursuant to this section may seek review of such determination in accordance with K.S.A. 60-2101 and amendments thereto." K.S.A. 2008 Supp. 75-2724(b). K.S.A. 60-2101(d) provides for appeals to the district court from decisions of political subdivisions, such as the City, and allows "an aggrieved party" to pursue an appeal.

The district court liberally construed "aggrieved party" in favor of allowing an organization such as FOB to seek judicial review of the Council's action. The Church argues that the district court's construction ignores the effect of K.S.A. 75-2725, which provides:

"The state of Kansas or any county, municipality or other political subdivision having capacity to sue and be sued, the Kansas state historical society and any city or county historical society which, for more than two (2) years prior to filing such action, has been organized, has elected officers and has received compensation, funds or reimbursements from a city or county pursuant to K.S.A. 12-1660 or 19-2649, and amendments thereto, may maintain an action in the district court having jurisdiction where an alleged violation occurred or is threatened for such equitable and declaratory relief as may be necessary to enforce the provisions of this act and to protect historic property from unauthorized or improper demolition, alteration or transfer."

K.S.A. 75-2725 authorizes the identified officials and entities to pursue equitable and declaratory relief to enforce the provisions of the Act. A fair reading of the statute suggests that it applies to instances in which persons or entities subject to the Act attempt an "end run" around the process. The statute refers to equitable and declaratory relief, such as enjoining such an end run around the Kansas Historical Preservation Act. That is not the nature of these proceedings. There was no end run here. The State Historical Society was notified of the proposed project, it conducted its study,

and it made its recommendations; then following consideration by the City's Planning Department, the matter came before the Council. The present action is simply an appeal pursuant to K.S.A. 2008 Supp. 75-2724(b) and K.S.A. 60-2101(d) seeking reversal of the Council's approval of the Church's permit application.

In *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 189 P.3d 494 (2008), a nonprofit association challenged the issuance of a landfill permit. Analyzing the association's standing to challenge the landfill permit, our Supreme Court noted:

"In particular, a person must demonstrate that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct. [Citations omitted.] An association has standing to sue on behalf of its members when '(1) the members have standing to sue individually; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested require participation of individual members. [Citation omitted.]' *NEACoffeyville v. U.S.D. No. 445*, 268 Kan. 384, 387, 996 P.2d 821 (2000)." *Bremby*, 286 Kan. at 761.

The *Bremby* court held that the association met those criteria. First, the members of the association would be harmed if the potential landfill leaked and contaminated the water supply on which its members relied. Second, the association was " 'organized for the purpose [of] preserving and enhancing the quality of life in Harper, Kingman and Sumner counties,' " and "ensuring that any landfill that is located in Harper County meet environmental standards to protect the groundwater supply and river water . . . germane to this purpose." 286 Kan. at 763. Finally, the association challenged the permit as arbitrary and capricious because it was issued on faulty environmental studies and that claim did not require the participation of the association's individual members.

### 1. Individual Members' Standing

In her affidavit filed with the district court, Barbara Quaney, president of FOB and a homeowner in the Bethany Place neighborhood, claimed the project if approved would "impinge upon my personal and economic interests." She asserted that the project "could also result in economic loss or the diminution of property value" of the century-old home she and her husband had restored

and three other residences she and her husband own in the neighborhood. Douglas Jones, Quaney's husband and another member of FOB, provided a similar affidavit. Other FOB members filed affidavits alleging that the project would impair the quality of their lives and interfere with their aesthetic appreciation of the neighborhood.

The Church argues that injuries to historical and aesthetic beauty are not sufficient to confer standing on an individual plaintiff, citing *Linsea*, 12 Kan. App. 2d at 660-61. Aesthetic concerns are a proper basis for land use controls. See *Gump Rev. Trust v. City of Wichita*, 35 Kan. App. 2d 501, Syl. ¶ 3, 131 P.3d 1268 (2006). Further, the lack of standing in *Linsea* was not because historic and aesthetic considerations were at issue. In *Linsea*, the County sought to make modifications to the grounds of the Chase County Courthouse in Cottonwood Falls. Linsea sued to stop the project, claiming that as a taxpayer he had an interest in the historical beauty of the property. The court concluded that Linsea's status as a taxpayer was insufficient to create standing because he failed to allege an injury unique to him that was not shared by every other taxpayer in Chase County. 12 Kan. App. 2d at 660-61.

Unlike in *Linsea*, at least two members of FOB alleged an injury to their properties as a result of the claimed lost historic and aesthetic value of Bethany Place. The injuries claimed by Quaney and Jones are particular to them and not shared by all other citizens of Topeka. See *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 176-77 (3d Cir. 2000); *cf. Linsea*, 12 Kan. App. 2d at 661. Accordingly, at least two member of FOB have individual standing. See *Rendell*, 210 F.3d at 175-78.

### 2. *FOB's Purpose Vis-a-Vis the Interests Sought to be Protected in This Suit*

The Church argues that FOB is organized for the sole purpose of preserving Bethany Place's historical integrity, not for protecting the economic interests of its members. However, FOB members Quaney and Jones assert that their economic interest in their properties in the neighborhood are tied, at least in part, to maintaining Bethany Place in its present form. Maintaining Bethany Place in

its present form is the expressed purpose of FOB. The interests FOB seeks to protect are germane to its purpose.

The Church argues that the FOB members who testified before the Council did not establish a nexus between FOB and the economic interests some of its members now assert. But standing relates to a party's qualification to proceed in court, not to participate in proceedings of their city government. The opponents who spoke at the Council meeting were residents of Topeka. They did not have to have standing to bring a court action in order to express their opinions to the Council on the merits of the Church's plan.

### 3. *Whether Participation of FOB's Individual Members is Required in the Suit*

FOB alleges its members' property value diminution not as a claim for relief but as a basis for standing. It does not allege that the Church or the City have violated any of the personal rights of its members, only that granting the permit violates the Kansas Historical Preservation Act. Further, FOB seeks only injunctive relief, not damages for its members. Therefore, the participation of FOB's individual members is not necessary. See *Bremby*, 286 Kan. at 762-63.

We conclude that FOB has standing to proceed in this matter.

### II. *Did The District Court Erroneously Reweigh The Evidence Before The Council, Evidence Which (According To The Church And The City) Provided Substantial Support For The Council's Decision To Grant The Permit?*

*Standard of Review*

The parties agree that the task of the district court was to review the Council's action to determine "whether, as a matter of law, (1) the tribunal acted fraudulently, arbitrarily, or capriciously, (2) the administrative order is substantially supported by evidence, and (3) the tribunal's action was within the scope of its authority." *Reiter v. City of Beloit*, 263 Kan. 74, Syl. ¶ 3, 947 P.2d 425 (1997). In doing so, the district court was not permitted to substitute its judgment for that of the Council.

On appeal, we apply the same standards of judicial review applicable to the district court. See *Reiter*, 263 Kan. at 85-86.

The district court, in its extensive 57-page memorandum decision, concluded:

"[T]he record evidences a lack of substantial evidence to support the statutory finding necessary that no feasible and prudent alternative existed. The record further lacks substantial evidence to support a conclusion that all possible planning was done to minimize the damage that would occur to the Bethany Place. These considerations, as noted, operate to make the Topeka City Council's decision stand as arbitrary, capricious, and unreasonable."

Thus, the central issue is whether substantial evidence supports the Council's decision. In resolving this issue, we apply the traditional rule that when examining the record for substantial evidence, we view the evidence and the reasonable inferences that can be drawn from the evidence in the light more favoring the prevailing party, here the Church. *Reiter*, 263 Kan. at 86; see *Jones v. Kansas State University*, 279 Kan. 128, 140, 106 P.3d 10 (2005). In doing so we do not substitute our own view on the merits of the Church's proposal. See *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 263, 75 P.3d 226 (2003). That was a matter for the duly elected officials of the City's governing body to determine. If substantial evidence supports the Council's decision, the decision must be upheld even if we would have decided the matter differently. *Praeger*, 276 Kan. at 263. Because there is a presumption that the governing body acted reasonably, the burden is upon FOB to prove otherwise. See *Jones*, 279 Kan. at 140; *Reiter*, 263 Kan. at 86. Finally, a reviewing court must accept as true the evidence and inferences supporting the Council's findings and disregard conflicting evidence and inferences. See *Jones*, 279 Kan. at 140.

Because our task is to examine anew the Council's action using the same standards applicable to the district court, we need not address all aspects of the district court's decision. However, FOB cites two matters discussed by the district court which, according to FOB, demonstrate deficiencies in the Council's action: (1) The lack of findings of fact to support the Council's decision; and (2) the Council's failure to consider the eight *Golden* criteria. See *Golden v. City of Overland Park*, 224 Kan. 591, 598, 584 P.2d 130

(1978). We will consider these issues before turning to the issue of the sufficiency of the evidence.

*Findings of Fact*

The Council was not required to make detailed findings of fact in order to properly act on the Church's application. See *Manly v. City of Shawnee*, 287 Kan. 63, 76, 194 P.3d 1 (2008); *Board of Johnson County Comm'rs v. City of Olathe*, 263 Kan. 667, 678, 952 P.2d 1302 (1998). Nevertheless, the better practice for governmental bodies in deciding these matters is to provide specific and detailed findings, and we encourage governmental bodies to do so. This is because findings of fact assist in providing us with a meaningful record for appellate review. As noted in *Golden*, 224 Kan. at 597: "A mere yes or no vote upon a motion to grant or deny leaves a reviewing court, be it trial or appellate, in a quandary as to why or on what basis the board took its action."

However, there are cases in which the reasoning behind the governmental body's action is otherwise apparent from the record. This is one of those cases. Here, contrary to FOB's assertion in its appellate brief, the motion before the Council was not simply to approve or deny the Church's permit. Councilman Preisner moved:

"At this time I'd like to make a motion to approve the communication to override the recommendation of the State Historical Preservation Officer and issue the parking lot permit.

"I base this on the City Council's consideration of all relevant factors, that there are no feasible and prudent alternatives to the proposal, and that all possible planning has been undertaken to minimize harm to the historic property."

The motion contained the essential findings for which there either is or is not substantial evidence in the record: (1) There are no feasible and prudent alternatives, and (2) all possible planning has been undertaken to minimize harm to the historic property.

If the lack of findings were to make it impossible for meaningful judicial review, the district court's recourse would have been to remand the case to the governmental body for it to make specific findings, as the trial court did in *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, 935-36, 218 P.3d 400 (2009).

The district court did not find the record so meager as to preclude its review and require a remand to the Council. Neither do we.

The conflict aired before the Council was not whether more Church parking should be allowed, but where it should be located. The issue turned on whether the suggested alternatives to the Church's plan were relevant factors to be considered in acting on the Church's permit application. If they were, the Church had the burden to prove that they were not feasible and prudent alternatives to the Church's plan. We conclude that the record before us is adequate to resolve this issue.

### The Golden Criteria

The Council did not consider the *Golden* factors, see 224 Kan. at 598, in deciding to grant the Church's permit application. *Golden* arose from the City of Overland Park's refusal to rezone a tract from C-O (office building) to CP-1 (planned retail). Our Supreme Court enumerated eight factors that "it would be well for a zoning body to bear in mind when hearing requests for change." 224 Kan. at 598.

Unlike in *Golden*, the present controversy involves no request to rezone the Church's property. Nevertheless, a variety of land use permit issues fall within the zoning rubric. See, *e.g.*, *Robert L. Rieke Bldg. Co. v. City of Overland Park*, 232 Kan. 634, 657 P.2d 1121 (1983) (which involved denial of a special use permit for the use of a searchlight to advertise a commercial enterprise); *Gump Rev. Trust*, 35 Kan. App. 2d 501 (which involved the denial of a conditional use permit for the erection of a telecommunications tower). However, *Gump* demonstrates the advisory nature of the *Golden* criteria. In *Gump*, the reasonableness of the denial of the permit application was based solely on aesthetic considerations, factors not even mentioned in *Golden*. As stated in *Board of Johnson County Comm'rs*, 263 Kan. at 677, the *Golden* criteria "are suggested factors only[— they are advisory in nature]. Other factors may be important in an individual case." See Syl. ¶ 6.

Here, the Church applied for a permit to construct a parking lot on its property. Because the project was to be constructed on property designated as historic on the State's Historic Registry, the

Church was required to submit its proposal to the SHPO, who reviewed it and opposed it. There is no contention that the Church would not be entitled to a permit had the SHPO approved the project. However, under K.S.A. 2008 Supp. 75-2724(a)(1), in order to overcome the SHPO's objection, the Church had to demonstrate that (1) there are no feasible and prudent alternatives and (2) all possible planning has been undertaken to minimize harm to the historic property. Those are the controlling factors for us to consider in this appeal, not the precatory *Golden* factors. The Council's action in approving the Church's permit was not unlawful for failure to consider the *Golden* factors.

### *The Church's Burden*

The SHPO opposed the project based on the determination that the proposed parking lot "will encroach upon, damage, or destroy the Bethany Place site." As noted above, in order to overcome this determination, the Church's first obligation was to demonstrate that there were no feasible and prudent alternatives to its proposed parking lot. Then, it was obliged to show that all possible planning has been undertaken to minimize harm to the historic property.

The Church was not obliged to refute every potential alternative unless the alternative constitutes a relevant factor. See *Lawrence Preservation Alliance, Inc. v. Allen Realty, Inc.*, 16 Kan. App. 2d 93, 95, 819 P.2d 138, *rev. denied* 250 Kan. 805 (1992). In order to qualify as a relevant factor, a potential alternative must be "something more than a mere suggestion as to possible alternatives." *Allen Realty, Inc. v. City of Lawrence*, 14 Kan. App. 2d 361, 373, 790 P.2d 948 (1990) (*Allen I*).

" 'A proposed alternative would be a relevant factor if it included sufficient factual information to support a conclusion that such alternative was feasible and prudent. A proposed alternative unsupported by such factual information could not form the premise of such a conclusion and would not be relevant.' [Citation omitted.]" *Reiter*, 263 Kan. at 89-90.

K.S.A. 75-2721(b) directs the SHPO to adopt rules and regulations to implement the State's historic preservation policy. Pursuant to K.S.A. 75-2721(b), the SHPO adopted K.A.R. 118-3-1(e), which defines "feasible and prudent alternative" as

"an alternative solution that can be reasonably accomplished and that is sensible or realistic. Factors that *shall be considered* when determining whether or not a feasible and prudent alternative exists include the following:

"(1) Technical issues;

"(2) design issues;

"(3) the project's relationship to the community-wide plan, if any; *and*

"(4) economic issues." (Emphasis added.)

### Discussion

The documents in the record as well as the testimony from the opponents of the plan are replete with heartfelt expressions of concern for preservation of the historic nature of the City's central core. The penultimate task of the Council, however, was to determine if there existed any feasible and prudent alternatives to the Church's proposal.

### Feasible And Prudent Alternatives?

As noted earlier, the record discloses several suggestions of alternative locations for the Church's parking lot.

Alex Kovalchuck proposed (1) angled parking on 8th and Polk, (2) parking lot(s) on Church property on the north side of 8th Street, and (3) a parking garage over the Church's current parking lot.

Barbara Quaney proposed building the parking lot at 716 S.W. 8th Street, 704 S.W. 8th Street, 701 S.W. 8th Street, or "cutback parking in the 800 block of Polk Street or along 8th Street in front of Grace Cathedral."

Hiram Stockwell also proposed the use of the Church's lots on the north side of 8th Street. He testified that the lot at 816 S.W. 8th Avenue contains "over 10,000 square feet and is approximately equal to the proposed parking space" and the lot at 804 S.W. 8th Avenue contains "over 6,000 square feet." He also suggested that the Church develop "additional space near the circular and south drives at the east side of the church" for parking for the handicapped and elderly.

Ed Spiess suggested restriping a portion of the existing parking lot to create more handicap-accessible spaces.

Alvin Greeson spoke in support of Stockwell's suggestion that the Church develop additional parking near the circle drive east of the Church.

Joanne Harrison suggested "turning the alley off of Polk Street the other direction, which would then quickly enable cars to move down to the present parking lot."

The City Planning Department's recommendation refers to the conclusion of the City traffic engineers that "angled 'cut-back' parking along SW Polk Street, adjacent to the Bethany Place property would be a feasible alternative to the proposed parking lot."

The SHPO suggested "parking stalls directly adjacent to the street at Polk and possibly 8th Street if needed."

None of these suggestions includes sufficient factual information to support a conclusion that it constitutes a feasible and prudent alternative to the Church's proposal. In determining whether a suggestion rises to the level of a feasible and prudent alternative that constitutes a relevant factor for the Council to consider, the suggestion must address technical, design, and economic issues, as well as the project's relationship to any community-wide plan. See K.A.R. 118-3-1(e), (j). Further, if an individual suggestion does not constitute a relevant factor for the Council to consider, the aggregation of two or more such suggestions does not convert them into relevant factors which the Council must consider.

Kovalchuck presented no cost estimates for his proposals, though he did acknowledge that they "may be more expensive [than the Church's proposal]." He also did not address any of the safety concerns raised by the Church that would arise from creating a parking lot that is separated from the Cathedral by Southwest 8th Avenue, a four-lane street, and would require attendees to climb 14 steps to reach the Cathedral. He did not address the Church's concerns about its inability to restrict the use of this proposed on-street parking to Church members.

Quaney expressed the opinion that angled parking could be constructed in a manner to satisfy handicap-accessibility standards. However, she did not address the Church's concerns about cost, safety, the use of Church funds to develop public property, or the inability to guarantee access to this street parking to Church mem-

bers. Neither she, nor any other opponent, explained how converting parallel street parking already used by Cathedral attendees to angled parking would solve the Church's need for at least 40 additional spaces.

Stockwell did not offer any cost estimates for his proposals. Greeson supported Stockwell's proposal for the circle drive. He testified that he measured the area and estimated there could be 32 additional parking places in that area. He did not provide any basis, other than his own lay opinion, to establish the feasibility of his proposal. Neither addressed Dean Lipscomb's observations about the impracticability of this site. Neither Stockwell nor Greeson provided any facts to suggest that relocating utility lines and the Cathedral's air conditioning system would be a prudent alternative to the Church's plan or how their suggestion would satisfy the Church's need for additional parking.

The proposal by Spiess to restripe the existing parking lot does not address the Church's need for additional parking spaces.

It is unclear how Harrison's suggestion would yield additional needed parking for the Church.

In suggesting the alternative of angled on-street parking, neither the SHPO nor the City's professional staff (who announced its position the day after the SHPO's decision) provided any analysis whatsoever in support.

There is no litmus test to definitively distinguish "mere suggestions as to possible alternatives," *Allen I*, 14 Kan. App. 2d at 373, from a suggestion that rises to the level of a relevant factor. Here, the continuum of suggestions extended from the proposed multistory parking garage at one extreme to the angled on-street parking at the other. We are convinced that none constitutes a relevant factor, even if espoused by a number of the project's opponents. However, if we assume for the sake of discussion that suggestions toward the latter end of the continuum are sufficient to constitute relevant factors, it is clear from the record (viewed in the light more favoring the prevailing party) that there is substantial evidence to establish that none is a feasible and prudent alternative.

No one challenged Bishop Wolfe's testimony regarding the Church's need for 40 parking spots and the need to accommodate its elderly and handicapped members.

Dean Lipscomb testified to the Church's consideration of the proposal by Stockwell and Greeson for added parking off the alley south of the Cathedral. He testified that "this isn't an option because there are utility poles and an air conditioning unit there the size of a freight car. Plus, we already use that space for parallel parking so the gain would be minimal."

Dean Lipscomb addressed the suggestion from Kovalchuck, Quaney, and Stockwell for a parking lot across the street from the Cathedral, noting the elevation differential that would require climbing 14 steps and crossing a busy street to reach the Cathedral.

With respect to the angled on-street parking suggestion, the Church provided the record's only engineering report, which indicates that if this suggestion were implemented the cost of surfacing material would increase from $16,800 to $36,000. Dean Lipscomb raised issues regarding safety if this suggestion were implemented, as well as the issue of expending Church funds to create parking spaces that could be preempted by nearby apartment dwellers, high school students, and the public at large to the exclusion of Church members. Further, converting parallel parking spaces to angled parking would create only a marginal net increase in available parking.

No one challenged any of Dean Lipscomb's concerns about the feasibility and prudence of the suggested alternatives with any evidence satisfying the standards expressed in *Reiter*, in *Allen I*, and in the administrative regulations of the State Historical Society.

The Council voted unanimously to override the recommendation of the SHPO and to grant the Church a permit based in part, as Councilman Preisner asserted in his motion, on the fact that "there [are] no feasible and prudent alternatives to the proposal." Under the standards expressed in *Reiter*, in *Allen I*, and in the administrative regulations of the State Historical Society, and confining our examination to the record now before us, none of the suggested alternatives constitutes a relevant factor which the Council was required to consider in acting on the Church's application.

On the other hand, if any suggestion can be found to have risen to the level of a relevant factor, then upon examining the facts in the record in the light more favoring the prevailing party, we find

substantial evidence to support the finding set forth in Councilman Preisner's motion that there were no feasible and prudent alternatives to the Church's proposal. Therefore, we conclude that there was substantial evidence to support the Council's finding that there were no feasible and prudent alternatives to the Church's proposal.

### All Possible Planning To Minimize Harm?

The Council's final basis for overriding the recommendation of the SHPO was that all possible planning had been undertaken to minimize harm to the historic property. There is substantial evidence of efforts by the Church to mitigate the effects of its proposed parking lot on the remainder of Bethany Place. FOB does not argue that there were other mitigation activities the Church could have employed but chose to ignore.

An engineering report documents that the project would involve 12,000 square feet of land, or 4.5% of Bethany Place. Bishop Wolfe testified that the Church would be planting "twice as many trees" as would be lost in the project, in addition to a line of bushes, to hide the parking lot from street view. Dean Lipscomb informed the City's Planning Department:

"Between Polk and the proposed parking lot, a three-foot tall hedge is already in place. When there are no cars in the parking lot (which will be only 60 feet wide), it will be invisible from the street. The far side of the lot (the west side) will be lined with mature trees. (Over 17 trees would remain between the lot and the buildings.)"

The Church's landscape plan shows that new, more desirable trees would be planted to replace the trees removed during construction. We find nothing in the record (and no arguments in the parties' briefs) to suggest that there were other mitigation activities the Church could have undertaken but chose to ignore. There is substantial evidence to support the Council's determination that all possible planning has been undertaken to minimize harm the project might cause to Bethany Place. See *Reiter v. City of Beloit*, 263 Kan. 74, 95-96, 947 P.2d 425 (1997).

We conclude that there is substantial evidence to support the Council's approval of the Church's permit application. In arriving

at a contrary conclusion, the district court was required to speculate about the existence of facts which are not in the record and to reweigh the evidence before the Council. Because of the limited role courts take in reviewing matters such as this, these are not practices in which we are permitted to engage. The weight and credit to be given the testimony at the public hearing and the written documents in the Council members' packets was for the Council to decide, not the courts. The district court erred in setting aside the Church's permit.

### III. Does The District Court's Decision Violate The Church's Rights Under The First Amendment To The United States Constitution Or Under The Religious Land Use And Institutionalized Persons Act, 42 U.S.A. § 2000cc (2006)?

Because we conclude that there was substantial evidence to support the Council's action, we reverse the contrary judgment of the district court. Thus, it is unnecessary to consider whether the district court's decision violated the Church's rights under the First Amendment to the United States Constitution or under 42 U.S.C. § 2000cc(a)(1)-(2) (2006) of the Religious Land Use and Institutionalized Persons Act of 2000.

### IV. Did The District Court Err In Refusing To Require FOB To Post A Supersedeas Bond For This Appeal?

When the Church expressed its intention to proceed with construction of the parking lot, FOB moved the district court for a restraining order to halt the project. The court granted the motion but refused to condition it upon FOB posting a bond. The Church appeals that ruling, claiming that K.S.A. 60-2101(d), when read together with K.S.A. 60-2103(d), required the district court to order FOB to post a supersedeas bond as a condition for the restraining order. FOB contends that the supersedeas bond provision in K.S.A. 60-2103(d) relates only to appeals *from* the district court, not appeals *to* the district court. The matter is now before the appellate court. The passage of time has rendered this issue moot.

The Church also complains that FOB was not required to post a supersedeas bond during the pendency of this appeal. But the

purpose of a supersedeas bond is to secure an appellant's stay of an adverse district court ruling while the matter is before an appellate court. K.S.A. 60-2103(d)(1), the provision for a supersedeas bond on appeal, provides: "Whenever an appellant entitled thereto desires a stay on appeal, such appellant may present to the district court for its approval a supersedeas bond . . . ." FOB is the appellee, not the appellant. It does not desire a stay of the district court's judgment. The provisions for a supersedeas bond have no application to FOB.

Because we are reversing the judgment of the district court, the Church is entitled to its permit as approved by the Council and to proceed with construction of the project. If FOB petitions for review of our ruling by the Kansas Supreme Court pursuant to Supreme Court Rule 8.03 (2009 Kan. Ct. R. Annot. 66), the provisions of Rule 8.03(i) will take effect.

Reversed and remanded with directions.

\* \* \*

GREENE, J., concurring and dissenting: I concur with the majority on the issue of standing, but I respectfully disagree with the analysis and holding of the majority in affirming the Topeka City Council's (Council) action to override the opinion of the State Historical Preservation Officer (SHPO) and would affirm the district court.

Our legislature has proclaimed that the "historical, architectural, and cultural heritage of Kansas is an important asset of the state and that its preservation and maintenance should be among the highest priorities of government." K.S.A. 2008 Supp. 75-2715. To that end, the legislature has created a comprehensive program of historic preservation "to foster and promote the conservation and use of historic property for the education, inspiration, pleasure and enrichment of the citizens of Kansas." K.S.A. 2008 Supp. 75-2715.

### The SHPO Opinion Explained

Here, the SHPO found—in accordance with federal standards—that the proposed parking lot would encroach upon, damage, or destroy Bethany Place, property listed on the Register of Historic

Kansas Places, and asked that the project be redesigned to take advantage of the City of Topeka's right-of-way. Upon request of the Grace Cathedral and The Episcopal Diocese of Kansas (collectively the Church), the SHPO later reconsidered its initial report and issued a more detailed explanation of its opinion. Due to a technical agenda requirement, the Council refused to include this letter of reconsideration in its record, and the members of the Council apparently were deprived of any opportunity to see the more detailed explanation and basis for the SHPO's opinion. The letter of reconsideration and explanation would have provided a more compelling analysis of the historic aspects of the area under consideration. I recognize that this letter of reconsideration technically may not be included in the record on appeal, but the express reference and discussion of the letter by the district court warrants our consideration of the letter on appeal. Excerpts include:

"Since the legal boundaries of the nomination include the property that is being considered for a parking lot, the May 8, 2007 SHPO comments used the 1995 edition of *The Secretary of the Interior's Standards for the Treatment of Historical Properties with Guidelines for Preserving, Rehabilitating, Restoring & Reconstructing Historic Buildings* (*Standards*) as required by K.A.R. 118-3-8(a). On page 13 of the *Standards* it states (emphasis [by SHPO]):

The building site consists of a historic building or buildings, structures, and associated **landscape features** within a designed or legally defined parcel of land. A site may be significant in its own right, or because of its association with the historic building or buildings. **The relationship between buildings and landscape features** on a site should be an integral part of planning for every work project.

"The guidelines make the following recommendations on page 102 (emphasis [by SHPO]):

Identifying, retaining, and preserving buildings and their features as well as features of the site that are important in defining its overall historic character. Site features may include circulation systems such as walks, paths, roads, or parking; **vegetation such as trees, shrubs, fields, or herbaceous plant material**; landforms such as terracing, berms or grading; furnishings such as lights, fences, or benches; decorative elements such as sculpture, statuary or monuments; water features including fountains, streams, pools, or lakes; and subsurface archeological features which are important in defining the history of the site.

Retaining the **historic relationship between buildings and the landscape**.

"To our knowledge the property in question has historically been characterized as an open space with landscaped features. It is these aspects that define the historic nature of the property, not the age of the mature trees. The *Secretary of the Interior's Standards for the Treatment of Historical Properties with Guidelines for Preserving, Rehabilitating, Restoring & Reconstructing Historic Buildings* does **not recommend** 'removing or radically changing buildings and their features or site features which are important in defining the overall historic character of the property so that, as a result, the character is diminished.' One of the key factors here is the historic relationship between the buildings and the landscaped open space. The parking lot as proposed would damage this relationship.

. . . .

"If we were to interpret the original nomination (1978) of Bethany Place to the Register of Historic Kansas Places as only including the two historic structures, then the proposed parking lot would be reviewed under the environs of the historic property as characterized in K.S.A. 75-2724. The proposed parking lot would be within the environs of both Bethany Place and Topeka High School. *Standards and Guidelines for Evaluating the Effect of Projects on Environs* (1998) were adopted under K.A.R 118-3-8 and have been consistently followed. Page 1 of this document reads (emphasis [by SHPO]):

The character of a historic property's environs should be retained and preserved. The removal or alteration of distinctive buildings, structures, landscape features, special relationships, etc. that characterize the environs should be avoided.

The environs of a property should be used as it has been historically or allow the inclusion of the new uses that require **minimal change** to the environs' distinctive materials, features, and spatial relationships.

Demolition of character-defining buildings, structures, **landscape features**, etc. in a historic property's environs should be avoided.

New additions, exterior alterations, infill construction, or related new construction should not destroy **character-defining features or spatial relationships** that characterize the environs of a property.

"Accordingly, historic landscape features and the spatial relationships between features on the property must be taken into consideration when making SHPO comments. As proposed the parking lot does change the spatial relationships on the property.

"The *Standards and Guidelines for Evaluating the Effect of Projects on Environs* specifically addresses parking lots. On page 5 it states that 'when new parking areas are required, design them to be consistent with the character of the environs and to include as little as possible.' It specifically states, that 'wholesale modification of traditional, character-defining parking patterns' is **not recommended**. The area proposed for the new parking lot is not consistent with traditional parking patterns on the site."

Based upon the majority opinion, the template for a city council to override the SHPO's opinion is an easy one: (1) Place the item on the public agenda; (2) Allow everyone to speak to the proposal; (3) Ignore the opinion of SHPO, especially the requested letter of reconsideration and explanation; (4) Have a council member make a well-stated motion (probably provided by legal staff); and (5) Vote to override the SHPO. Should it really be this easy for a municipal governing body to override the well-reasoned opinion of the SHPO?

## *The District Court Opinion*

The district court clearly believed that the process was flawed. Although our focus is primarily on the action of the Council, *Lawrence Preservation Alliance, Inc. v. Allen Realty, Inc.*, 16 Kan. App. 2d 93, 102, 819 P.2d 138 (1991), *rev. denied* 250 Kan. 805 (1992), here the district court opinion provides a valuable guide to the flaws in the process. After a comprehensive review of the record, the court noted a number of procedural irregularities, among them:

"[T]here may be a question of whether the judgment presented for review is presented in sufficient form such that it may be judicially reviewed in accordance with the above standards. The Topeka City Council's ultimate decision was initiated in the form of a motion. . . .

. . . .

"Thus, without a writing summarizing the reasons or some expression of the reasons on the record, the record itself is the only evidence available for deducing the reasons for the Council's vote on the permit and is, therefore, the determinant of both the Court's ability to review the record and its sufficiency to support the judgment made. Whether this record, such as it is, is sufficient in questionable, at best. See, *Board of County Comm'rs v. City of Olathe*, 263 Kan. 667, 668 (1998).

. . . .

"The presentations made and the documents submitted to the Topeka City Council identified alternatives to the Diocese's parking lot proposal. These alternatives involved cutback parking along Polk Street, on Eighth Street, or an adjacent alley and/or the use of vacant property belonging to the Diocese located proximately on Eighth Street for the additional parking desired. Information was also provided about reassigning or reconfiguring Grace Cathedral's current parking just to the west and adjacent to the church or along its current drive on the

east or reconfiguring the alleyways. No other alternatives were presented by any participant or commentator.

"The Topeka Planning Department recommended disapproval of the Diocese's request based on the viability of the 'cutback' parking alternative presented; however, whether the other alternatives suggested were investigated and compared is unknown from the record. The Shawnee County Historical Society supported the alternative. The Historic Old Town Neighborhood Improvement Association opposed the parking lot in favor of the alternatives presented.

. . . .

"The record is substantially devoid, except as to the stated need to cross Eighth Street and the overall safety of the 'neighborhood,' of an explanation or proffer as to placing parking lots on the Diocese's other owned and proximate property. No comment was made as to expansion of its east drive. The Diocese argued to the Court, not the Council, that reconfiguration of its existing lot on the west of the church to create more handicap spaces would reduce the parking spaces available in that lot. In addition, the Topeka City Council was given pictures, diagrams, and the state preservation officer's opinion and those of others in writing, but principally only from opponents. Also, a video of the Grace Cathedral area in aid of the alternatives was delivered to the Council by a speaker in opposition, but not played, but, for some reason, it is not part of the record.

. . . .

"What then would be the 'substantial evidence' relied upon to support a *no* feasible and prudent alternative existed finding unless one is required to treat each alternative proposed as mutually exclusive of any other alternative proposed and the common place solutions employed universally elsewhere throughout the City are ignored? Such would not seem the intent of the Kansas Historic Preservation Act or a proper implementation of it.

. . . .

"Other than the Topeka City's Planning Department's brief statement in the record in support of an alternative to the parking lot, the record is devoid of any evidence that would show any comparison or planning that would measure other alternatives or assess, objectively, the Diocese's purported need. As noted, if any alternative proposal had been seen as not *entirely* feasible and prudent simply because it did not adequately address Grace Cathedral's expressed need for more handicapped or elderly parking, which certainly stands as worthy, if needed, it, nevertheless, calls into question why Grace Cathedral would need forty to forty-three parking spaces if not all were to be used for that category of attendees and why other alternatives would not suffice to fill the balance of the expressed needs. This, itself, reflects that this second tier or phase of the statutory inquiry was never addressed from the perspective of the City, or by the Diocese as the parking lot proponent, at any point in the process. Certainly a ten slot parking lot ostensibly serves as a mitigated consideration in and of itself. However, it also opens inquiry into why ten slots could not be opened along the Cathedral's east side drive or in

the western lot, with a ramp added, in satisfaction of this specific need, while yet allowing the other alternatives to serve those attendees without special needs.

. . . .

"Accordingly, the Court is of the opinion, particularly when noting all these latter considerations, that 'in light of the record,' '[the Topeka City Council] [did not take] a hard look at all relevant factors, and using plain common sense, [base] its determination on the evidence.'

. . . .

"The importance of [the SHPO letter of reconsideration and explanation] was that it was generated after the Diocese itself requested the State Historic Preservation Office to reconsider its opinion, so it, accordingly, should have been an official part of the statutory process precedent. . . .

"In a judicial or quasi-judicial proceeding, if a litigant referenced an item not in evidence, then an objection would be had, or the typical hearing practice would require that the speaker and proponent be advised that the document that was referenced was not in evidence or had not been made available to the trier of fact. However, no one with knowledge of this omission spoke up at Council meeting, thus further leaving the Council with the opinion, then on the floor, that the State Historic Preservation Officer's opinion was less than sound.

"Another incidence where a speaker might have thought his materials proffered would be in the record, but do not now appear in the record, is the circumstance noted involving the video by Alex Kovalchuck of the Grace Cathedral's environs where alternative parking was thought available. Again, Mr. Kovalchuck was not advised that his video was not being received. Notwithstanding, although Mr. Kovalchuck *did* provide a copy of his video to the Council at that time, it is clear it never made the record and was never viewed before the Council's decision.

. . . .

"Also, here, from review of the transcript and video of the City Council's meeting, it is obvious some Council members were dubious of their authority to challenge the Diocese's plans based on *First Amendment* religious grounds and knowledge of *Mount St. Scholastica, Inc. v. City of Atchison,* 482 F. Supp. 2d 1281 (D. Kan. 2007). . . .

. . . .

"Here, *no* evidence exists before the Court that would remotely indicate that either the Kansas Historic Preservation Act, or the Act's particular implementation here by Kansas Historical Society, was grounded other than on the sound premise of securing historic environs for benefit of future citizens. Accordingly, any consideration of deference to the Diocese or Grace Cathedral because of their status as religious entities would have been a wholly improper consideration and would not have been a 'relevant factor' in approving or disapproving the Diocese's requested permit to build a parking lot on the Bethany Place environs.

"Here, the Court has scrutinized, as carefully as it can, the record presented such as to attempt to accord a basis to sustain, and thus give deference to, the Topeka City Council's decision. The record is one that is not only difficult to

follow, but one that is marginally evidential. It is a record that does not lend itself to extrapolating any cogent reason or reasons for the Topeka City Council's decision. As such, the Court has been unable to locate that necessary basis for deference to its finding for all of the reasons heretofore discussed.

. . . .

"Notwithstanding, here, it seems clear that while each alternative proposed to the Intervenors' parking lot proposal is not required to separately satisfy the whole of the Intervenors' needs, but rather each may be considered collectively and in combination, the Topeka City Council, nevertheless, failed to do so. As a consequence, the record evidences a lack of substantial evidence to support the statutory finding necessary that *no* feasible and prudent alternative existed. The record further lacks substantial evidence to support a conclusion that all possible planning was done to minimize the damage that would occur to the Bethany Place. These considerations, as noted, operate to make the Topeka City Council's decision stand as arbitrary, capricious, and unreasonable. Accordingly, the decision of the Topeka City Council is set aside."

Did the district court overstep its limited boundaries here? I respectfully suggest that it did not and that its judicial decree was soundly based upon a thorough review of the record and a careful application of controlling authorities.

### *The Applicable Statutory Standards as Interpreted by Our Supreme Court*

The applicable statute, as interpreted by our Supreme Court, sets a far higher threshold for overriding the SHPO than has been recognized by the majority here. K.S.A. 2008 Supp. 75-2724(a) provides in material part:

"[S]uch [a proposed] project shall not proceed until:

"(1) . . . the governing body of the political subdivision . . . has made a determination, based on a consideration of *all* relevant factors, that there is *no* feasible and prudent alternative to the proposal and that the program includes *all* possible planning to minimize harm to such historic property resulting from such use." (Emphasis added.)

In *Reiter v. City of Beloit*, 263 Kan. 74, 947 P.2d 425 (1997), our Supreme Court examined this statute and provided guidance on the question what constitutes a "relevant factor." It concluded:

" '[A] proposed alternative would be a relevant factor if it included sufficient factual information to support a conclusion that such alternative was feasible and prudent. A proposed alternative unsupported by such factual information could

not form the premise of such a conclusion and would not be relevant.' [Citation omitted.]

"However, the term 'relevant factors' is not necessarily limited to proposed alternatives. The term 'relevant factors' authorizes the governing body to take into consideration all relevant factors relating to the project under consideration. This authorization extends to all those factors logically connected to the ultimate decision of whether there is a feasible and prudent alternative to the proposal and whether the program includes all possible planning to minimize harm to the historical property at issue . . . .

. . . .

"Another relevant factor that we believe may be considered by the governing body is the report and reasoning of the SHPO. As we noted above, the Kansas State Historical Society and SHPO play a major role in any determination concerning the preservation of historic property. . . . The SHPO's report and the information or lack thereof used by the SHPO in making such a determination may be considered by a governing body as a relevant factor under K.S.A. 75-2724." 263 Kan. at 89-91.

The court then further stated:

"We believe that the information relied upon by the SHPO is a relevant factor that may be considered by the governing body under K.S.A. 75-2724 and that its relevance does not end with the initial determination made by the SHPO that triggers the need for a determination by the governing body.

. . . .

". . . [T]he ultimate question for appellate review is whether the governing body took a hard look at all relevant factors and, using plain common sense, based its determination upon the evidence. [Citation omitted.]" 263 Kan. at 92-94.

### Applying These Statutory Standards to the Record of Council Action

My chief disagreement with the majority is that these statutory standards as interpreted require far more than a routine determination of whether substantial competent evidence supports the Council's determination. The entire premise of the majority opinion is that our role starts and stops with such a determination, even though the majority gives lip service to the three-prong standard embraced in *Reiter*—under which the substantial evidentiary support test is but one prong. Neither our appellate courts nor the federal courts applying similar standards have ever reduced the appellate task to such simplicity.

As noted by our court in *Allen Realty*, the legislature has patterned the standards contained in K.S.A. 75-2724 after a nearly identical federal act governing projects of the U.S. Department of Transportation, see 49 U.S.C. § 303 (2006). *Allen Realty*, 16 Kan. App. 2d at 100-01. These same or nearly identical standards also appear in other federal administrative enactments. See, *e.g.*, National Environmental Policy Act of 1969, 42 U.S.C. § 4321 (2006) *et seq.* Accordingly, federal case law is helpful in applying the Kansas standards. See *Allen Realty*, 16 Kan. App. 2d at 101.

In fact, it appears that our courts took a page from federal courts in embracing the "hard look" test as the ultimate question on appeal of such matters. See *Allen Realty*, 16 Kan. App. 2d at 102 (*quoting Hickory Neighborhood Defense League v. Burnley*, 703 F. Supp. 1208, 1219 [W.D.N.C. 1988], *modified on other grounds* 893 F.2d 58 [4th Cir. 1990]); compare *Reiter*, 263 Kan. at 94. There is a host of federal law explaining and applying both the "relevant factor analysis" and the "hard look" test in circumstances not unlike that before us. These federal cases—as well as our own appellate opinions—demonstrate that the simplistic approach of the majority opinion is inappropriate in this context.

First, our appellate courts and federal courts have concluded that the relevant factor test is an integral part of the "arbitrary and capricious" test and that the record of the administrative proceedings must affirmatively show consideration of the relevant factors. *Allen Realty*, 16 Kan. App. 2d at 103; see *In re Dept. of Energy Stripper Well Exemption*, 520 F. Supp. 1232, 1269 (D. Kan. 1981), *rev'd on other grounds* 690 F.2d 1375 (Temp Emerg. Ct. App. 1982), *cert. denied* 459 U.S. 1127 (1983). Thus, our task in these cases extends to a rather unique examination beyond a mere determination of substantial evidence support; indeed, the district court applied the correct standard and found the Council's actions arbitrary and capricious.

Second, federal courts have concluded that the application of the relevant factors test requires that agency action be set aside if the agency has relied on factors which the legislative branch has not intended it to consider, it entirely failed to consider an important aspect of the problem, or it offered an explanation for its de-

cision counter to the evidence before the agency or was so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Assn. v. State Farm Mut.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983); *Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1050-51 (10th Cir. 1998).

Third, although there is no statutory requirement in Kansas for formal findings by the governing body in this context, the federal Administrative Procedure Act (APA), 5 U.S.C § 706 (2006), requires at least a brief statement of the grounds for an agency decision, the statement must be sufficiently detailed that the reviewing tribunal can appraise the agency's determination under the appropriate standards of review, and it must be sufficiently detailed so that the appellate court can determine whether the relevant factors were determined and that the decision was based on those factors and otherwise reasonable. *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997).

Finally, in applying the hard look test, courts have set aside "agency actions" when the agency failed to assess or study the feasibility of a proposed alternative (*International Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1259 [D. Wyo. 2004]); when the agency failed to consider the possible availability of public funding for a proposed alternative (*Benton Franklin Riverfront Trailway v. Lewis*, 701 F.2d 784, 791 [9th Cir. 1983]); and when the agency failed to allow meaningful participation of the State Historical Society in a demolition project (*Allen Realty*, 16 Kan. App. 2d at 108).

Our appellate courts have suggested that relevant factors must include sufficient factual information to support a conclusion that such alternative is both feasible and prudent. *Reiter*, 263 Kan. at 89-90; *Allen Realty, Inc. v. City of Lawrence*, 14 Kan. App. 2d 361, 373, P.2d 948 (1990). The majority concludes that *none* of the myriad of alternatives proposed to the Council "includes sufficient factual information to support a conclusion that it constitutes a feasible and prudent alternative to the Church's proposal," applying the criteria of K.A.R. 118-3-1(e). See *Friends of Bethany Place*, 43 Kan. App. 2d at 207. In so concluding, the majority would have

*each citizen proponent* of the alternative present a fully docu-
mented plan including technical issues, design issues, the project's
relationship to the community-wide plan, and economic issues.

With due respect, this paradigm turns the regulation and the
statutory standard on its head. If the law expects a citizen propo-
nent to present such a fully documented proposal of an alternative
to the demolition of historic property, there will certainly be no
feasible alternatives to worry about. The majority places entirely
on the citizen proponent the burden that belongs to—or at least
shared with—the governing body; that is, our courts and federal
courts have consistently set aside proposed actions because an
agency or governing body—here the Council—failed in its duty to
investigate, study, assess, or otherwise look into the technical, de-
sign, and economic issues of alternative proposals. See *Benton
Franklin*, 701 F.2d at 791; *International Snowmobile Mfrs.*, 340 F.
Supp. 2d at 1259. Indeed, the proponent of the project has the
burden to prove no acceptable alternative exists, and the governing
body has the duty to determine whether alternatives presented are
feasible and prudent. K.S.A. 2008 Supp. 75-2724 (duty of govern-
ing body); *Reiter*, 263 Kan. at 89 (burden on proponent); *Lawrence
Preservation Alliance Inc. v. Allen Realty, Inc.*, 16 Kan. App. 2d
93, 95, 819 P.2d 138 (1991), *rev. denied* 250 Kan. 805 (1992). Here,
the governing body was fully capable of calling on a host of internal
departments for assistance in evaluating the alternatives; instead,
the only internal department advice that it received was completely
ignored. The view of the majority renders meaningless the hard
look standard, which most courts have held to place a significant
duty on the agency or governing body. See, *e.g.*, *Hickman Trust v.
City of Clay Center*, 266 Kan. 1022, 1040-42, 974 P.2d 584 (1999).

### *Was the Council's Decision Arbitrary, Capricious, and Unreasonable?*

Applying this guidance to the entire record before us, I would
conclude that the Council's action in overriding the opinion of the
SHPO was arbitrary, capricious, and unreasonable for the following
reasons:

(1) The detailed letter of reconsideration and explanation from the
    SHPO was clearly a relevant factor that should have been fully
    considered by the Council, particularly because it provided a

comprehensive basis for the SHPO's determination. See *Rei-ter*, 263 Kan. at 90-91 (the report and reasoning of SHPO is a relevant factor to be considered). The exclusion of the letter from consideration by the Council based upon a technical agenda requirement was wholly unreasonable, especially given the city attorney's statement that had the letter simply been handed out at the Council meeting, it would have been received. One of the highest priorities of our government, historic pres-ervation, should not be overridden without a full consideration of the underlying bases for the SHPO's determination. Where the governing body entirely fails to consider the report and rea-soning of the SHPO in this context, I would hold the resulting action to be inherently flawed. See *Motor Vehicle Mfrs.*, 463 U.S. at 43; *Ross*, 162 F.3d at 1050-51.

(2) Given the importance of factual information to support a pro-posed alternative, the failure of the Council to view, consider, and receive the Kovalchuck video may be viewed as at least unreasonable and possibly capricious. Although it is impossible for this court to know what may have been included in the video, it is clear from the record that Kovalchuck intended to present a video demonstrating the feasibility of numerous de-tailed alternative proposals, including the "cut-in" parking, *ad-ditional* "cut-in" parking, two lots owned by the Church that could be converted to parking, and multi-level parking, all of which were characterized by Kovalchuck as "feasible, reason-able proposals." As noted by the district court, "[I]t is clear [the video] never made the record and was never viewed be-fore the Council's decision." This procedural flaw fatally con-taminated the proceedings, especially if one agrees with the majority in placing principal responsibility on citizen propo-nents to document alternatives.

(3) As noted by the district court, the numerous alternative pro-posals listed by the district court were never considered *in combination* as being either feasible or prudent. I agree with the district court in concluding that a failure to consider in combination the alternative proposals, or any subset of them, and to test or analyze any combination of these alternatives for feasibility and prudence is highly problematic. In its duty to determine whether "there is *no* feasible and prudent alterna-

tive to the proposal," surely the governing body is not to view each alternative in isolation. See K.S.A. 2008 Supp. 75-2724.

(4) The imprimatur of the City's Planning and Engineering Departments for the feasibility of "cut-in" parking seems not to have been given its inherent weight. These departments recommended "DISAPPROVAL" of the Church's proposed parking lot "in light of alternative and feasible alternatives that will not encroach upon or damage the listed property," including angled parking that the district court noted would result in 150% more space dedicated to parking than the Church's proposal. Although there was a brief presentation to the Council regarding this recommendation, there was no further investigation or assessment of cost or possibility of cost sharing, and there was absolutely no questioning or discussion by Council members thereafter to demonstrate a hard look at the City's own departmental recommendation and alternative proposal.

(5) The record is completely devoid of any evidence to establish that the Church's proposal reflected *"all* possible planning to minimize harm to such historic property resulting from such use." (Emphasis added.) Granted, the Church's representatives mentioned a "plan" to plant new trees along Polk Street, but I remain unconvinced that this *unenforced* suggestion adequately reflected *"all* possible planning to minimize harm." As fully documented by the district court, a host of potential ideas to further minimize harm were never addressed by the Church or the Council. This should be contrasted with the steps taken by the municipality in *Reiter*, where 12 specific steps to minimize harm were "raised and addressed" by the planning commission and council and thereafter legally *enforced* as conditions in the motion to approve the project. See *Reiter*, 263 Kan. at 81-84. This statutory requirement, that all possible planning be executed to minimize harm, was not met with a mere idea or unenforced notion to plant some new trees along a narrow strip of land adjoining the street.

(6) Did the governing body here truly "take a hard look" at relevant factors and base its determination on the evidence of such alternative proposals and plans to minimize harm? Like the district court, I conclude the answer to this "ultimate question for appellate review" (*Reiter*, 263 Kan. at 94) is no. Thorough

examination of the record does not convince me that there was any hard look at the relevant factors, and there was clearly no consideration of plans to minimize harm. Instead, I am convinced that the determining factor for the Council was concern of litigation based on First Amendment issues, and this is most evident not only in the clear weight of the discussion by Council members but in the city attorney's response to Councilman Harmon that "a denial of the parking permit could create some legal issues." As noted by the district court, this consideration was not only legally incorrect, it was totally outside the considerations required by Kansas law. Where an agency or governing body has relied on a consideration beyond those specified by the legislature, this alone can render the resulting action arbitrary. See *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43.

(7) Although the majority correctly notes that detailed findings of fact and conclusions of law are not required to be made by the governing body under these circumstances, it is clearly the better practice for the governing body to explain its action. Where no such findings have been made, at least to the extent of explaining the basis for the action of approval, I believe we should subject the action of the governing body to a higher degree of scrutiny. It has long been the law in Kansas that quasi-judicial action requires some explanation of its basis in order for the reviewing court to determine whether the decision reached has met the applicable legal standards. See, *e.g.*, *Neeley v. Board of Trustees, Policemen's & Firemen's Retirement System*, 205 Kan. 780, Syl. ¶ 5, 473 P.2d 72 (1970). This general precept is clearly recognized in the federal cases within this context. See, *e.g.*, *Friends of the Bow*, 124 F.3d at 1215. It is generally recognized that the necessity for findings is to facilitate judicial review, avoid judicial usurpation of administrative or legislative functions, assure more careful consideration to protect against careless and arbitrary action, assist the parties in planning or preparing cases for rehearing and judicial review, and keep such agencies or governing bodies within their jurisdiction as prescribed by the legislature. *In re Tax Appeal of Bernie's Excavating Co.*, 13 Kan. App. 2d 476, 478, 772 P.2d 822, *rev. denied* 245 Kan. 784 (1989). Here, a complete review of the record leaves one with more questions than

answers. What did the Council think of the alternative proposed and approved by the City's Planning and Engineering Departments? Was the Church's concern for safety in the angled parking shared by the City's Planning, Traffic, or Public Safety Departments? Why were some combinations of the myriad alternative proposals not considered? Was the City willing to bear some or all of the cost of one or more alternative proposals? Was there other public funding that might have been available to share in the costs? Were there specific concerns that the Council felt rendered some or all of the alternatives neither feasible nor prudent? Were there other steps that could have been taken to minimize harm to the subject property? Why did the City not enforce some concern for the historic aspects of the property in approving the parking lot or at least enforce, through conditions of approval, other possible steps to minimize harm? Would consideration of the detailed letter of reconsideration and explanation from the SHPO have made a difference? In the absence of such findings, we are left to mere speculation as to the basis for the Council's decision. Our appellate courts have required that the record of such land-use planning and control proceedings "affirmatively show consideration of the relevant factors." *Allen Realty*, 16 Kan. App. 2d at 103. There is no such affirmative showing in this record.

In summary, I conclude that the entire process was materially flawed, that we simply do not know what the Council's decision was based upon, that the statutory considerations were never adequately addressed by the governing body, that there was no hard look at the relevant factors including alternative proposals, that there was absolutely no discussion of exhausting "all possible planning to minimize harm," that perhaps the most relevant factor— the basis for the SHPO's opinion—was never considered, that the decision of the governing body was heavily influenced by inappropriate legal concerns, and that the ultimate determination of the Council was not based on the evidence of feasible and prudent alternatives or the minimization of harm, but rather on apparent extraneous factors that should have played no role in whether to override one of the highest priorities of government in Kansas: historic preservation under K.S.A. 2008 Supp. 75-2715.

I would affirm the district court's decision setting aside the Council's action as arbitrary, capricious, and unreasonable.